DA 06-0217

IN THE SUPREME COURT OF THE STATE OF MONTANA

2008 MT 51

RICHARD A. VETTEL-BECKER,

Plaintiff and Appellant,

v.

DEACONESS MEDICAL CENTER OF BILLINGS, INC.,
d/b/a/ DEACONESS BILLINGS CLINIC,

Defendant, Appellee and Cross-Appellant.

APPEAL FROM: District Court of the Thirteenth Judicial District,
In and For the County of Yellowstone, Cause No. DV 2002-1145
Honorable Susan P. Watters, Presiding Judge

COUNSEL OF RECORD:

For Appellant:

Elizabeth J. Honaker, Honaker Law Firm, Billings, Montana

For Appellee:

Edward J. Butler, Raymond M. Deeny, Sherman & Howard, LLC,
Colorado Springs, Colorado

John G. Crist, Crist Law Firm, LLC, Billings, Montana

Submitted on Briefs: April 4, 2007

Decided: February 13, 2008

Filed:

_____
Clerk

Justice Patricia O. Cotter delivered the Opinion of the Court.

¶1 Plaintiff Richard Vettel-Becker (Vettel-Becker) appeals the District Court's entry of summary judgment in favor of the defendant Deaconess Medical Center of Billings, Inc., doing business as Deaconess Billings Clinic (Deaconess). Deaconess cross-appeals the denial of its motion requesting attorney's fees. We reverse and remand.

¶2 After he was terminated from his employment with Deaconess, Vettel-Becker filed a claim before the Montana Human Rights Bureau (HRB) alleging discrimination in employment. He also filed in District Court a claim of wrongful discharge from employment under the Wrongful Discharge from Employment Act (WDEA), §§ 39-2-901 through 915, MCA (2005). Later, after the Department of Labor dismissed his discrimination charge, he added a claim in his District Court case for employment discrimination under the Montana Human Right Act (MHRA), Title 49, Chapter 2, MCA, and for blacklisting under § 39-2-802, MCA. The District Court entered summary judgment in favor of Deaconess on all counts. Vettel-Becker does not appeal the District Court's determination that he failed to demonstrate a prima facie case of discrimination, nor does he appeal the dismissal of his blacklisting claim. However, he argues that summary judgment on the WDEA claim was improper because his WDEA claim relies on facts distinct from his MHRA claim. He asserts that these facts raise a genuine issue about whether Deaconess had good cause to terminate him, precluding summary judgment.

**ISSUES**

¶3 We restate Vettel-Becker's issues on appeal as follows:

¶4  (1)  Did the District Court correctly conclude that his filing a MHRA claim precluded Vettel-Becker's subsequent pursuit of a claim under the WDEA?

¶5  (2)  Did the District Court correctly conclude that Deaconess was entitled to summary judgment as a matter of law on the WDEA claim?

¶6  Deaconess raises one issue on cross-appeal:

¶7  (3)  Did the District Court err in denying Deaconess its attorney's fees?

## FACTUAL AND PROCEDURAL BACKGROUND

¶8  After fifteen years of providing pastoral and management services to Deaconess, Vettel-Becker was terminated from employment for not being a "good fit" and for receiving "mixed reviews" on an evaluation.

¶9  Vettel-Becker started working as a chaplain for Deaconess on August 1, 1986. He was soon promoted to manager of the Pastoral Care Department (PCD) on June 28, 1987. His responsibilities included supervising the PCD staff, including other chaplains and an administrative assistant, and providing pastoral care to patients. He was also appointed to oversee the Healing Environment Program (HEP), a committee dedicated to making Deaconess a more welcoming and comforting place through art, music, animals, etc. During his first ten years at Deaconess, he and a physician started and participated on a medical ethics committee that continues to serve Deaconess today. He was also an integral part in starting the Continuing Pastoral Education Program. His employment record reveals no problems with his job performance from 1986 to 1999.

¶10 Vettel-Becker reported to Dr. Nick Wolter, CEO of Deaconess, from 1997 until 2000 when Carlene Lewies, now known as Carlene Crall (Crall), a human resources supervisor, was assigned to oversee the PCD.

¶11 In 1998, Vettel-Becker separated from his wife, and in 1999, they divorced. Vettel-Becker remarried in June 2000. Upon remarriage, he hyphenated his name to reflect his new wife's name and his.

¶12 Perhaps coincidentally, around the same time as his divorce and after nearly thirteen years of managing the PCD without complaint, Vettel-Becker's job performance began to come under scrutiny in 1999. Dr. Wolter received reports that the PCD was lacking morale. A former chaplain, Karl Guhn, made complaints about Vettel-Becker to Crall, and Chuck Heath, a chaplain, resigned from the department and complained about Vettel-Becker in his resignation letter. Notably, these complaints were not the proffered reason for Vettel-Becker's later discharge, but they did result in Wolter asking Vettel-Becker to meet one-on-one with Terry Radcliffe, a management consultant, who had been hired by Deaconess to oversee the recent merger and run workshops to improve management.

¶13 Radcliffe and Vettel-Becker met several times in 1999 and 2000, and the results of these meetings were positive. Vettel-Becker completed a critical self-evaluation, received feedback about his leadership style, and strove to improve the morale of the PCD. He reduced his involvement in the HEP to spend more time in the PCD, and he organized a retreat for his department.

4

¶14 In July 2000 other members of the Deaconess staff evaluated Vettel-Becker's work performance. The results of this so-called "360" evaluation were mixed. Although Radcliffe observed improvements in Vettel-Becker one-on-one, Crall advised Vettel-Becker to continue meeting with Radcliffe. When Crall became his supervisor in October 2000, she assured Vettel-Becker that he was getting a clean slate and that he was not being terminated.

¶15 Crall noted in her July 2001 evaluation of Vettel-Becker that his efforts at changing appeared to be helping the department. Giving Vettel-Becker an overall rating of 3.5, Crall wrote in her overall comments:

> You have shown a desire to continue to improve as a leader of Pastoral Care. Your continued dedication to the Healing Environment but balancing that with your department responsibilities has been positive. Stepping down from chairing the Healing Environment has been helpful for you.
> Our working relationship seems to be effective, the access to me seems to have made you more comfortable in dealing with issues.
> I would like you to continue to work with Terry Radcliffe on development of the Pastoral Care team over this next year. I look forward to observing continued growth in your position.

¶16 On October 17, 2001, Radcliffe sent Crall a report on his progress with Vettel-Becker. Radcliffe had both praise and criticism to offer. On the one hand, he complained of Vettel-Becker's tendency to be defensive and his excessive concern about past events. He also opined that Vettel-Becker did not know Deaconess' "[v]alues" or "[c]ore [c]ompetencies." On the positive side, he found Vettel-Becker unfailingly respectful, adaptable, and willing to carry on with a difficult evaluation process.

¶17     In November 2001 Vettel-Becker became concerned about several confusing, offensive, and questionable comments Radcliffe made to him during their meetings. For instance, Radcliffe told Vettel-Becker that his public recognition of employees was inappropriate and seen as an attempt to bring attention to himself. He also told Vettel-Becker that his hyphenated name "pisses" him off and that other people at Deaconess felt the same. As a result of this concern, Vettel-Becker sent Crall a memo on November 15 asking that Crall tell Radcliffe to refrain from making such comments and that they discuss any confusion or concerns surrounding his name change at their next meeting.

¶18     On November 21, 2001, Crall received an update from Radcliffe (Addendum) about his work with Vettel-Becker. Radcliffe's Addendum was considerably less complimentary of Vettel-Becker than his October 17 report had been. He admitted to telling Vettel-Becker that his name pissed him off, and "that it was possible I was not the only one who considered this inappropriate behavior." Among other things, Radcliffe said that Vettel-Becker may not be living up to the societal expectations of his role as manager of Pastoral Care at Deaconess. By the tone of his memo, it was evident that Radcliffe was offended by the fact that Vettel-Becker had complained to Crall about him. Radcliffe wrote to Crall:

> How much time should you give him from this date? Depends upon how much more you can stand. My recommendation: End of January unless he exhibits strong indications of changing. If he does show contriteness, apologizes, seeks reconciliation, gives some of the money back to the store, offers me some direct communication about what he said about me, indicates to you that he has been off base in his behavior, actually changes his high "I" behavior, then I would stretch the time a bit.

6

He also wrote "[t]he other good news is that I know a person who would be a great replacement for him."

¶19    At some later point in time, Crall wrote an undated memo to Wolter summarizing issues with Vettel-Becker. This memo listed Vettel-Becker's inappropriate behaviors, referenced the negative feedback he had received on his 2001 evaluation, and recommended his termination and a change for the department. This memo, which formed the basis for the later firing of Vettel-Becker on September 30, 2002, only briefly referred to the results of Vettel-Becker's August 2002 evaluations, described below.

¶20    In August 2002 PCD and other Deaconess staff members Meg Hatch, Susan Thomas, Douglas Johnson, and Dr. Robert Pueriyer, filled out another evaluation of Vettel-Becker. Again the results were mixed, but many acknowledged improvements and efforts by Vettel-Becker in certain problem areas. Hatch made the following comments:

> I feel he *has* made improvements in his job performance, but his underlying character remains the same. Often I often [sic] get the feeling that he is "going through the motions" and doing things he resents. To me, this job seems to be a strange fit for his personality. At a Christmas party at his home, where he was surrounded by artists, I was struck by how much more comfortable he seemed to feel with them than he does when he is in a clergy role. At his best, Richard is creative and dynamic. At his worst, he is self-centered and paranoid. Although there is little I can point to in terms of failure to do his job, I know that many staff (including me) and patients, too, look to a chaplain for the kind of inspiration, encouragement, compassion, and spiritual guidance that does not seem to come naturally to Richard (at least not anymore).

¶21    In their evaluations of Vettel-Becker, Johnson and Pueriyer painted a very different picture than that painted by Hatch. At the end of his evaluation Johnson added,

7

"I like working with Richard. I feel he respects me as a fellow chaplain and provides direction when it is needed, but also respects and encourages my ability to do my job well." Dr. Pueriyer also added the comment that "Richard is a leader in Ethics and Grief Mgt. A definite attribute to the team."

¶22 Ultimately, Wolter advised Vettel-Becker of his termination on September 30, 2002. Ironically, that same day Vettel-Becker was notified that he was going to receive a managerial bonus in his next paycheck. His termination became official on October 10, 2002, after he rejected a proposed severance package. The reasons given to Vettel-Becker for his termination were that he was "not a good fit" at Deaconess and that his last 360 evaluation (in 2001) showed mixed reviews.

¶23 On December 24, 2002, Vettel-Becker filed a charge of discrimination against Deaconess with the HRB. Then, on December 31, 2002, Vettel-Becker filed a complaint in District Court alleging that his discharge was not for good cause and violated personnel policies. He demanded a jury trial. On June 27, 2003, the Department of Labor investigator dismissed Vettel-Becker's discrimination charges. On September 26, 2003, Vettel-Becker filed an amended complaint in Yellowstone County District Court, alleging (1) a WDEA violation; (2) employment discrimination based on his gender, religion (Episcopalian) and marital status; and (3) a claim for blacklisting and punitive damages.

¶24 Deaconess filed an answer and affirmative defenses. Subsequently, on Deaconess' motion, the District Court granted summary judgment in favor of Deaconess on all three counts of the amended complaint. The court dismissed Vettel-Becker's MHRA claim

because he failed to make a prima facie case of marital status, gender, or religious discrimination. The court also found that, even if Vettel-Becker had established a prima facie case of discrimination, Deaconess demonstrated legitimate, non-discriminatory reasons for his termination that he failed to rebut as pretextual. The court also dismissed Vettel-Becker's WDEA claim, concluding that the MHRA provided the exclusive remedy for his discharge *and* discrimination claims because he raised the same facts in support of both claims. Finally, the court dismissed the blacklisting claim because Vettel-Becker failed to raise sufficient facts to preclude summary judgment.

¶25 Vettel-Becker appeals only the entry of summary judgment on his WDEA claim. Deaconess cross-appeals the denial of its request for attorney's fees. We reverse and remand for a trial on merits of Vettel-Becker's WDEA claim. For that reason, we do not reach the cross-appeal.

## STANDARD OF REVIEW

¶26 We review orders of summary judgment de novo. *Arthur v. Pierre Ltd.*, 2004 MT 303, ¶ 14, 323 Mont. 453, ¶ 14, 100 P.3d 987, ¶ 14. We use the same M. R. Civ. P. 56 criteria applied by the district court to determine whether no genuine issue of material fact exists and whether the movant is entitled to judgment as a matter of law. *Delaware v. K-Decorators, Inc.*, 1999 MT 13, ¶ 56, 293 Mont. 97, ¶ 56, 973 P.2d 818, ¶ 56.

¶27 Where the movant has met its burden of showing that no genuine issues of material fact exist, the opposing party bears the burden of establishing an issue of material fact by more than mere denial or speculation. *Delaware*, ¶ 56, quoting *Bruner v. Yellowstone County*, 272 Mont. 261, 264, 900 P.2d 901, 903 (1995). All reasonable

inferences which can be drawn from the evidence presented must be drawn in favor of the non-moving party. *Cape v. Crossroads Correctional Ctr.*, 2004 MT 265, ¶ 12, 323 Mont. 140, ¶ 12, 99 P.3d 171, ¶ 12.

¶28 This standard applies in the summary judgment context of a wrongful discharge claim, under § 39-2-904, MCA. Where an employee seeks to defeat an employer's argument that a legitimate business reason supports the discharge, the employee

> must offer evidence upon which a fact-finder could determine that the reason given by the employer was false, whimsical, arbitrary or capricious, or unrelated to the needs of the business. [Citations omitted.] The employee cannot defeat the employer's motion for summary judgment by merely denying the employer's given reason or by speculation; he or she must show facts sufficient to raise an issue to be decided by a fact-finder.

*Delaware*, ¶ 58.

## DISCUSSION

¶29 **Did the District Court correctly conclude that the filing of a MHRA claim precluded Vettel-Becker's subsequent pursuit of a claim under the WDEA?**

¶30 Title 39, Chapter 2, Section 9 of the Montana Code Annotated sets forth the procedural and substantive framework for wrongful discharge from employment claims in Montana, and provides the exclusive remedy for a wrongful discharge from employment, with certain exceptions. Section 39-2-902, MCA. Those exceptions, found at § 39-2-912, MCA, include discharges that are subject to state or federal statutes prohibiting unlawful discrimination and discharge in retaliation for reporting unlawful discrimination.

¶31 Title 49, Chapter 2, sets forth the substantive and procedural rules that govern illegal employment discrimination claims in Montana. Amongst those is the exclusivity of remedy provision, as follows:

> [t]he provisions of this chapter establish the *exclusive remedy* for acts constituting an alleged violation of chapter 3 or this chapter, including acts that may otherwise also constitute a violation of the discrimination provisions of Article II, section 4, of the Montana constitution or 49-1-102. *A claim or request for relief based upon the acts may not be entertained by a district court other than by the procedures specified in this chapter.*

Section 49-2-509(7), MCA (emphasis added). The issue before us is whether this provision barred Vettel-Becker's WDEA claim under § 39-2-902, MCA.

¶32 Vettel-Becker contends that the exclusive remedy provision of the MHRA would not preclude his pursuit of a WDEA claim in district court *unless* an affirmative determination in his favor had been made under the MHRA, citing *Tonack v. Montana Bank of Billings*, 258 Mont. 247, 255, 854 P.2d 326, 331 (1993). In *Tonack,* the plaintiff sued for both wrongful discharge from employment under the WDEA and for age discrimination under the Age Discrimination in Employment Act (ADEA), 29 U.S.C. §§ 621-634. Tonack was awarded damages under both Acts. This Court reversed, concluding that a favorable determination under the ADEA precluded a recovery under the WDEA. Importantly for purposes of this case, the Court stated:

> Whether a discharge will ultimately be "subject to any other state or federal statute that provides a procedure or remedy for contesting the dispute" is not immediately known when a claim is filed. This must be determined before it is known whether the Wrongful Discharge Act may be applied. It is established only when a finder of fact has made that determination or when judgment on the claim has otherwise been entered. Therefore, we conclude that claims may be filed concurrently under the Wrongful Discharge Act and other state or federal statutes described in § 39-2-912,

11

MCA, but if an affirmative determination of the claim is obtained under such other statutes, the Wrongful Discharge Act may no longer be applied.

*Tonack*, 258 Mont. at 255, 854 P.2d at 331.

¶33 Here, because Vettel-Becker did not receive an affirmative determination of his discrimination claim, he argues that his WDEA claim is not barred.

¶34 Second, Vettel-Becker maintains that the gravamen of his discharge claim is not the same as the gravamen of his discrimination claim. Vettel-Becker argues that he has offered facts—completely aside from any allegations of discrimination—that negate Deaconess' proffered good cause for terminating him. He maintains that given the positive evaluations that more closely predated his discharge, together with his receipt of a bonus with his last paycheck, he raised a genuine issue of material fact as to whether he was terminated for the reasons Wolter gave him.

¶35 Deaconess argues that Vettel-Becker had his bite at the apple and that the MHRA bars another bite. Deaconess suggests that by choosing the remedy under the MHRA, Vettel-Becker waived any and all potential claims under the WDEA. Deaconess notes that the MHRA states specifically that a district court cannot entertain any claim for relief based upon acts constituting an alleged violation of the MHRA, except through provisions of the MHRA. We disagree with Deaconess' characterization of the exclusive remedy provision as applied to the facts before us.

¶36 The District Court correctly noted this Court's holdings in *Tonack* and *Arthur*. In *Arthur*, this Court held that the MHRA "bars a plaintiff from pursuing other tort claims where those claims arise from underlying allegations of . . . discrimination." *Arthur*,

12

¶ 18. The District Court also observed that if an affirmative determination of a claim is obtained under other statutes as described in § 39-2-912, MCA, the WDEA may no longer be applied, citing *Tonack*. However, the Court further noted that where an affirmative determination of a claim under federal statute was *not* obtained because the administrative agency determined that the discharge did not fall under the type of activity protected by the statute, this Court has permitted the discharged employee to pursue a WDEA claim. *See Schultz v. Stillwater Mining Co.*, 277 Mont. 154, 157, 920 P.2d 486, 487-88 (1996). As we noted in *Schultz,* if there is no remedy under the administrative statute, then the plaintiff would have no procedure or remedy for his dispute if his subsequent complaint for wrongful discharge were barred. *Schultz,* 277 Mont. at 157, 920 P.2d at 488 (Schultz, the plaintiff, first sought but was denied relief for retaliatory discharge under the Federal Mine Safety and Health Act).

¶37 Here, Vettel-Becker was denied relief under the MHRA; thus, he maintains his WDEA claim should not be barred. However, the District Court concluded that the MHRA precluded Vettel-Becker's claim under the WDEA because he relied on the same facts for his WDEA claim as he did for his MHRA charges of discrimination. After reviewing the record in the case, and our decisions in both *Tonack* and *Schultz,* we must disagree. Because Vettel-Becker's MHRA claim was disallowed, he is entitled to seek relief under the WDEA, provided that claim is not premised upon "underlying allegations of . . . discrimination." *Arthur,* ¶ 18. In this regard, we conclude his WDEA claim is not otherwise barred under the MHRA or *Arthur* and its progeny because Vettel-Becker's WDEA claim is not based upon "underlying allegations of . . . discrimination."

13

¶38 Wrongful discharge can be proven in several ways, one of which is by demonstrating that the employer lacked good cause for the discharge. "Good cause for discharge" is defined as reasonable job-related grounds for dismissal based on (1) a failure to satisfactorily perform job duties; (2) disruption of the employer's operation; or (3) other legitimate business reason. Section 39-2-903(5), MCA. We define a "legitimate business reason" as "a reason that is neither false, whimsical, arbitrary or capricious," and logically related to the needs of the business. *Buck v. Billings Montana Chevrolet, Inc.*, 248 Mont. 276, 281-82, 811 P.2d 537, 540 (1991). A court must balance the right of an employer to exercise discretion over who it will employ and keep in employment against the legitimate interests of the employee to secure employment. *Buck*, 248 Mont. at 282, 811 P.2d at 540. "The balance should favor an employee who presents evidence, and not mere speculation or denial, upon which a jury could determine that the reasons given for his termination were false, arbitrary or capricious, and unrelated to the needs of the business." *Johnson v. Costco Wholesale*, 2007 MT 43, ¶ 23, 336 Mont. 105, ¶ 23, 152 P.3d 727, ¶ 23, quoting *Kestell v. Heritage Care Corp.*, 259 Mont. 518, 526, 858 P.2d 3, 8 (1993).

¶39 Deaconess did not present evidence or argue that Vettel-Becker failed to satisfactorily perform job duties or disrupted his employer's operation; therefore, under § 39-2-903(5), MCA, Vettel-Becker is left with defeating the arguably "legitimate business reason[s]" Deaconess gave Vettel-Becker as "good cause" for his discharge: his mixed reviews and his not being a "good fit." Vettel-Becker's WDEA claim rested on debunking the Deaconess' proffered legitimate business reasons for discharge by

14

showing that they were false, whimsical, arbitrary or capricious. Vettel-Becker does not rely on the same facts that supported his discrimination claim, such as Radcliffe's comments to him about his hyphenated name. Rather he relies on facts supporting his theory that the discharge was arbitrary, including the fact that his most recent evaluation showed improvement, the fact that he received a managerial bonus with his last paycheck, and the fact that Crall (who openly disliked Vettel-Becker according to some) provided Wolter with a summary of specific "inappropriate" incidents, which Vettel-Becker's witnesses in turn refuted, raising an inference of pretext. In short, Vettel-Becker's WDEA claim does not rest or depend upon establishing discrimination. Therefore, the MHRA is not, under these facts, Vettel-Becker's exclusive remedy for his wrongful discharge claim.

¶40 Discrimination can occur without a wrongful discharge and wrongful discharge can occur without a discriminatory act. Along these same lines, there can be facts supporting a claim for discrimination and other facts supporting a claim for wrongful discharge arising from the same case. Where the plaintiff charges discrimination but fails to demonstrate a prima facie case entitling him to recover, the dismissal of his discrimination claim does not preclude a wrongful discharge claim, as long as that claim is not premised upon underlying allegations of discrimination. Therefore, we turn to the propriety of summary judgment on the merits of the case.

¶41 **Did the District Court correctly conclude that Deaconess was entitled to summary judgment as a matter of law on the WDEA claim?**

15

¶42 Vettel-Becker argues he presented sufficient facts, and not mere speculation, that raise a genuine issue of material fact as to whether good cause supported his termination. Vettel-Becker specifically argued before the District Court that the reasons he was given for his discharge were false, whimsical, arbitrary, or capricious.

¶43 "In order for an employee to create an issue of fact on the issue of good cause in regards to a pretext, the employee must 'prove that the given reason for the discharge . . . is a pretext and not the honest reason for the discharge.' " *Johnson*, ¶ 28, quoting *Arnold v. Yellowstone Mountain Club, LLC*, 2004 MT 284, ¶ 26, 323 Mont. 295, ¶ 26, 100 P.3d 137, ¶ 26. In challenging the legitimacy of the proffered reasons for his discharge, Vettel-Becker points out that his 2002 evaluations showed improvement as did the 2001 evaluation by Crall. He also points out that attached to his last pay check was a managerial bonus for achieving goals. Vettel-Becker supports his pretext claim by presenting Crall's summary of issues that she gave to Wolter and that explained her reasons for wanting to discharge Vettel-Becker. He also points to the fact that Crall told him he would have a clean slate upon reporting to her in 2000, and yet she recommended his termination sometime in 2001 or 2002, listing incidents dating back to before 2000. These facts raise a genuine issue of material fact as to the legitimacy of his termination for "mixed reviews."

¶44 The second ostensible reason for Vettel-Becker's discharge was that he was "not a good fit" at Deaconess. On its face, this reason without more does not suggest a legitimate business reason for a termination. As Vettel-Becker argues, the record reflects that he worked at Deaconess for sixteen years during which time his "fit" was never a

16

problem. Moreover, Vettel-Becker provided evidence that there were staff at Deaconess that believed him to be a good fit, a good team player, and a good pastor.

¶45 Because Vettel-Becker raised genuine issues of material fact regarding the legitimacy of the proffered reasons for his discharge, we conclude it was error for the district court to enter summary judgment against Vettel-Becker on the merits of his wrongful discharge claim.

## CONCLUSION

¶46 For the foregoing reasons, we conclude that the District Court erred in concluding that Vettel-Becker's WDEA claim was precluded by the exclusive remedy provision of the MHRA. We further conclude that the court erred in granting Deaconess summary judgment without reaching the merits of the WDEA claim. Therefore, we reverse and remand for a trial of Vettel-Becker's WDEA claim.

/S/ PATRICIA COTTER

We Concur:

/S/ KARLA M. GRAY
/S/ JAMES C. NELSON
/S/ JOHN WARNER
/S/ W. WILLIAM LEAPHART
/S/ BRIAN MORRIS
/S/ JIM RICE

17