DA 06-0244

IN THE SUPREME COURT OF THE STATE OF MONTANA

2008 MT 63

PATRICIA A. SAUCIER, by Mary Mallory,
her Limited Guardian,

        Plaintiff and Appellant

   v.

McDONALD'S RESTAURANTS OF MONTANA,
INC., a Montana corporation; McDONALD'S
CORPORATION, a Delaware corporation, and
ALEX KEETON,

        Defendants and Appellees,

   and

JOHN DOES 1-3,

        Defendants.

APPEAL FROM:    District Court of the Thirteenth Judicial District,
                    In and For the County of Yellowstone, Cause No. DV-2003-279
                    Honorable Gregory R. Todd, Presiding Judge

COUNSEL OF RECORD:

      For Appellant:

           Brent R. Cromley, Nancy Bennett, Moulton, Bellingham, Longo
           & Mather, P.C., Billings, Montana

      For Appellees McDonald's Restaurants and McDonald's Corporation:

           James M. Shore, Zahraa Wilkinson, Stoel Rives LLP, Seattle, Washington

           Bruce F. Fain, Murphy, Kirkpatrick & Fain, LLP, Billings, Montana

                  Submitted on Briefs:  January 10, 2007

                           Decided:  February 26, 2008

Filed:

_____

Justice Patricia O. Cotter delivered the Opinion of the Court.

¶1    Mary Mallory ("Mallory"), acting as limited guardian for her niece Patricia A. Saucier ("Saucier"), filed this suit on Saucier's behalf in the District Court of the Thirteenth Judicial District, Yellowstone County, asserting tort claims and discrimination claims against McDonald's Corporation and McDonald's Restaurants of Montana, Inc. (collectively "McDonald's") and Alex Keeton. The District Court granted summary judgment in favor of the defendants on all claims except the discrimination claims against Alex Keeton. Mallory appeals.

¶2    We consider the following issues:

¶3    (1) Did the District Court err in concluding that Saucier's tort claims are barred as a matter of law?

¶4    (2) Did the District Court err in concluding that McDonald's sufficiently established an affirmative defense to Saucier's discrimination claims?

¶5    We affirm in part and reverse and remand in part.

**FACTUAL AND PROCEDURAL BACKGROUND**

¶6    Saucier was born in Billings, Montana on September 9, 1977. The record indicates that six months after her birth she became afflicted with spinal meningitis which significantly and permanently impaired her brain function. After her parents divorced in 1983, she lived at times with her mother in Montana, and at times with her father in Mississippi. While the record contains few details about her early childhood, it does indicate that Saucier received special education and speech therapy through the public school system. When Saucier reached the age of eleven, her mother contacted the

3

Montana Department of Family Services, apparently seeking assistance in caring for Saucier. Subsequently, under conditions which are not made clear in the record, Saucier was placed in the Deaconess Psychiatric Center in Billings. She also spent time at the Rivendell Psychiatric Hospital and a foster home. Apart from her temporary placements with these institutions, Saucier lived primarily with her aunt, Mallory.

¶7 In December of 1989, shortly after Saucier had reached the age of twelve, the District Court of the Thirteenth Judicial District, Yellowstone County, found her to be "seriously mentally ill" and ordered her committed to Rivendell Psychiatric Center in Billings pursuant to § 53-21-127, MCA, where Dr. Ralph Yaney, a psychiatrist, conducted an assessment of her. In his written report, Dr. Yaney determined that Saucier suffered from "severe to moderate mental retardation." He also determined that Saucier "is functioning at the age of 2 or 3 or 4 emotionally" and that she "seems to have no ability to understand right or wrong." Thus, Dr. Yaney did not conduct any psychological testing, as he deemed Saucier to be functioning "at too low of a level to allow any psychological assessment." Despite these conclusions, he stated that placement at the Rivendell Psychiatric Center was not appropriate for Saucier. Rather, Dr. Yaney concluded, she needed "either a trial in a psychiatric hospital for children and/or ultimately institutional care." In this regard, he noted that Saucier's parents refused to take her back into their care, and her aunt no longer felt that she could care for Saucier.

¶8 During the subsequent years, Saucier resided in several residential treatment homes in Montana, Wyoming, and Idaho. When she reached the age of eighteen, Saucier

4

was placed at the Milk River Group Home in Glasgow, Montana. The records from her time at this institution state that she was assessed by staff members as being "at risk of emotional, physical, sexual and financial exploitation." Additionally, under circumstances which are not made clear in the record, a case manager at the home prepared a "Certification of Disability" regarding Saucier and sent it to the Montana Department of Motor Vehicles. This document stated that, based on medical and psychological reports, Saucier was considered permanently disabled pursuant to § 39-30-103, MCA.

¶9 The record indicates that in 1998, when Saucier reached the age of twenty-one, she returned to Billings. Thereafter, she was able to live on her own in an apartment provided by the Billings Housing Authority, with monitoring and assistance provided by local YWCA officials apparently affiliated with a state sponsored social-services program. She received Social Security disability benefits and supplemented this income by periodically working part-time jobs, such as washing dishes at a restaurant and doing laundry at a hotel. While she was permitted to retain and spend the income she received from working, her disability benefits were directed to YWCA officials who ensured that those funds were used to pay her rent, utilities, and other bills. Additionally, the YWCA provided various activities in which Saucier participated, including the Special Olympics.

¶10 In August of 2001, local officials sent Saucier to Dr. Debra Sheppard, a neuropsychologist, for psychological evaluation apparently in connection with the Social Security disability benefits program. Dr. Sheppard rendered a report stating that Saucier was having difficulty maintaining employment and that she "has a 'trainer' who comes in

5

to help her with household chores as she is not able to do these independently." The case-worker who accompanied Saucier to this evaluation disclosed that "Saucier requires an abundance of repetition to establish comprehension."

¶11 Dr. Sheppard's report also states that "Saucier's responses resulted in a Full Scale IQ of 57" which "places her overall intellectual skills in the Extremely Low range of intellectual functioning or below the first percentile when compared to a group of her same aged peers." In further detail, Dr. Sheppard's report states:

> Ms. Saucier earned a Verbal IQ of 65, which is in the Extremely Low range. She performed within the mildly impaired range on tasks measuring her rote memory for numbers and practical judgment. Moderate impairment was observed on tasks assessing her vocabulary skills, ability to recognize abstract relationships, and general fund of information. Severe impairment was observed on a task requiring mental computational skills.
> Ms. Saucier's Performance IQ of 55 is in the Extremely Low range. She performed within the moderate impaired range on tasks tapping abilities and the separation of essential from unessential detail, visual-motor coordination, the recognition of spatial relationships and abstract reasoning. Severe impairment was observed on a task tapping abilities in temporal sequencing.

As a result of this assessment, Dr. Sheppard concluded that Saucier "will require significant assistance for the foreseeable future."

¶12 In October of 2001, shortly after Dr. Sheppard rendered her assessment, Saucier, now twenty-four, applied for employment at the McDonald's restaurant on Central Avenue in Billings. Two friends assisted her in filling out the application, and she was subsequently hired by the restaurant manager, Alex Keeton ("Keeton"), to work as a "lobby person." Saucier worked approximately fifteen to twenty hours per week in this "auxiliary position," as McDonald's identified it, which entailed cleaning the dining area

6

and restrooms, and hauling garbage to the dumpster. While she initially worked a lunch-time shift, Saucier was transferred to a shift later in the afternoon because high school students subjected her to teasing during the lunch hour.

¶13 Approximately four months after Saucier began her job at McDonald's, she became involved in a sexual relationship with Keeton, who was married. Keeton's conduct with Saucier, particularly in regard to his capacity as restaurant manager, and the alleged negligence of McDonald's in connection therewith, are the underlying subjects of this litigation.

¶14 Keeton admits that he engaged in secret episodes of "hugging and holding" with Saucier at McDonald's, in a stockroom located in the restaurant's basement. According to Saucier, the physical contact in these incidents was such that Keeton achieved orgasm. Keeton also admits that he had sexual intercourse with Saucier on two occasions after the night shift ended, with the first of these occurring on Valentine's Day in 2002. These incidents occurred when Keeton took Saucier to deposit the restaurant's cash at a bank, and then drove her in "the company car" to the outskirts of Billings. The record suggests that Keeton may have changed Saucier's work schedule to facilitate these encounters in the McDonald's vehicle. Additionally, Keeton admits that he had sexual intercourse with Saucier at her apartment on one occasion. According to Saucier, this incident also occurred after they had made a bank deposit following an evening shift.

¶15 During the course of the relationship, Keeton admits, he told Saucier that he loved her "on many occasions." Keeton also admits that he knew Saucier was mentally disabled. As Keeton put it, he knew that she was "unable to solve complex problems."

7

Further, Keeton admits that he told Saucier not to tell anyone about their sexual relationship, explaining to her that such disclosure "could hurt both of us."

¶16    Although Saucier asserts that she "didn't like" some of Keeton's advances, and that she asked him to stop at times, she has stated that she was "in love" with him. She has also stated that she did not actually love him, and yet told him she did. In explaining why she made this statement to him, Saucier has stated: "Because I didn't know what else to say. I don't have a good comprehend or speak. I just do what people do."

¶17    In addition to repeatedly telling Saucier that he loved her, Keeton admits he also told her that he might leave his wife and that, if that happened, he "would like to marry [Saucier]." Further, according to Saucier, Keeton told her that he could "have a lot of women" because he is a Mormon.

¶18    In late March or early April of 2002, Keeton told Saucier that they could spend time together during a week in April when his wife was scheduled to be out of town. Specifically, Keeton admits he told Saucier that if she had the time off work, they would spend a "mini-honeymoon week" at his house. Consequently, Saucier submitted a written request to be excused from work for that entire week, and Keeton approved the request in his capacity as the restaurant manager. According to Saucier, Keeton directed her to submit this request.

¶19    On April 4, 2002, Keeton dropped his wife off at the airport and drove to Saucier's apartment, where she then packed clothes and other items for a week-long stay at Keeton's residence. Keeton then drove Saucier to his house and they engaged in sexual intercourse. Although he led Saucier to believe that they would spend the entire week

together at his residence, Keeton drove Saucier back to her apartment shortly after their sexual encounter, and told her that they would not continue their relationship.

¶20    Thereafter, Saucier contacted her older sister, Sandra Sanderson ("Sanderson"), and reported that she "was having problems at McDonald's" with "a guy named Alex [Keeton]." According to Sanderson, Saucier reported that "he had taken [her] off the [work] schedule, Alex did, and she was concerned, because she needed the money." Ultimately, Saucier informed Sanderson about the sexual activity between her and Keeton.

¶21    Sanderson called McDonald's and reported Keeton's conduct. In response, McDonald's sent Saucier a letter stating that she could return to the restaurant and work her regularly scheduled shifts. When two members of McDonald's management first questioned Keeton about his conduct with Saucier, he denied that they had a sexual relationship. Shortly thereafter, however, Keeton admitted his sexual relationship with Saucier, and McDonald's terminated his employment.

¶22    As noted above, Keeton repeatedly told Saucier he loved her, and also expressed a desire to marry her. The record suggests this had a significant impact on Saucier. As YWCA case-worker Terry Baptiste testified in deposition, Saucier is "desperate" for attention. Not surprisingly, Dr. Sheppard determined approximately five months after the relationship with Keeton had ended, that Saucier still "appears to be fixed on the belief that [Keeton] will honor promises made to her regarding the continuation of a more permanent relationship."

¶23 Shortly after Keeton's conduct was exposed, legal counsel was obtained for Saucier and her aunt, Mallory, was appointed as her limited guardian for the purpose of this litigation. Pursuant to the Montana Human Rights Act, § 49-2-303, MCA, Mallory filed a Complaint in June of 2002 on Saucier's behalf with the Human Rights Bureau of the Department of Labor and Industry. The Complaint, which was filed against Keeton and McDonald's Corporation, alleged inter alia that: (1) Keeton discriminated against Saucier on the basis of her gender and also on the basis of her disability by subjecting her to a sexually hostile and offensive work environment; and (2) McDonald's Corporation failed to take effective action to prevent Keeton's discriminatory conduct.

¶24 In December of 2002, after conducting an investigation, the Human Rights Bureau issued its Investigative Report concluding that the relationship between Keeton and Saucier had been consensual. Thus, the Bureau concluded that the allegations of discrimination were not supported by a preponderance of the evidence. Accordingly, the Complaint was dismissed and the Bureau provided notice that Mallory was entitled to pursue the discrimination claims in district court.

¶25 In August of 2002, while the Human Rights Bureau was engaged in its investigation, Dr. Sheppard again conducted a psychological evaluation of Saucier. The results were consistent with the results of the assessment Dr. Sheppard had made one year earlier, before Saucier began working at McDonald's. Again, the testing demonstrated that Saucier possesses "a Full Scale IQ of 57." Additionally, Dr. Sheppard conducted an "adaptive behavior" assessment, which measures language skills, "daily living" skills, and socialization skills. The results of this assessment demonstrated that

Saucier's "level of adaptive functioning overall is equivalent with what would be expected of a child age 8 years, 7 months." Ultimately, Dr. Sheppard concluded her report in a manner consistent with the previous year's assessment, stating: "It is highly recommended that consideration be given toward appointing a guardian for Ms. Saucier. She clearly needs assistance in making decisions regarding her welfare."

¶26 Shortly thereafter, in September of 2002, counsel for Saucier sought Dr. Sheppard's opinion regarding Saucier's capacity to appreciate the consequences of a sexual relationship, her capacity to welcome or reject sexual advances, and her capacity to enter into contracts. In response, Dr. Sheppard opined that while Saucier has the ability to seek out or reject sexual advances, she possesses an "extremely limited capacity" to appreciate the consequences attendant to a sexual relationship. Dr. Sheppard also opined that Saucier was not capable of entering into contracts because of "her state of mild mental retardation and impaired practical/social judgment."

¶27 In the spring of 2003, Mallory filed the instant action in the District Court, on Saucier's behalf, against McDonald's and Keeton, as well as other McDonald's employees identified only as "John Does 1-3." The Complaint alleged, inter alia, that: (1) Keeton "made sexual advances and engaged in offensive conduct of a sexual nature" toward Saucier; (2) Keeton, with the consent of McDonald's, "required [Saucier] to work late hours with him, and even removed her from the weekly work schedule, so that she would be available for sexual relations and his sexual gratification"; (3) Keeton, with the consent of McDonald's, required Saucier to work the closing shift and then used "the car provided by McDonald's of Montana to make night deposits and, under the

11

pretext of driving [Saucier] home, would then take [her] to remote areas of Billings in the McDonald's company car and have sexual intercourse with her"; (4) Saucier "lacks the mental capacity to understand or appreciate the consequences of a sexual relationship" and she "was not able to consent to any of the sexual misconduct of Keeton"; (5) McDonald's "entered into a special relationship of custody and control over [Saucier]" during her employment with the restaurant; (6) McDonald's failed to adequately train, supervise, and take proper precautions for the safety of its employees, thereby allowing Keeton to take advantage of Saucier, which he did in the course and scope of his employment with the restaurant; (7) the Defendants "discriminated against [Saucier] on the basis of her sex and disability by creating and subjecting [her] to a sexually hostile and offensive work environment"; (8) the Defendants acted with actual malice, as evidenced by a "deliberate, reckless, and intentional disregard for the high probability of injury" to Saucier; and (9) Saucier suffered damages as a result of the Defendants' acts and omissions. Pursuant to these allegations, the Complaint asserted various tort claims, along with claims of gender discrimination and disability discrimination, against both Keeton and McDonald's. Finally, the Complaint requested both compensatory and punitive damages.

¶28 During the course of the litigation, Dr. James English, a neuropsychologist, conducted a psychological evaluation of Saucier, at the request of McDonald's. Among other things, his report states that during the testing Saucier "was overwhelmed with tasks that required her to repeat and recall any form of verbal material." The report further states that Saucier's "logical grammatical reasoning skills were generally consistent with

the 11- to 12-year-old range." Based on the various forms of testing, Dr. English determined: "Her capacity to reason is generally consistent with her IQ and in the range similar to the lower 5 or 6% of the adult population. That is, her reasoning abilities are not unlike those of an 11- or 12-year-old child." Despite these findings, however, Dr. English concluded that Saucier has the capacity to consent to a sexual relationship, stating she "commands a basic understanding and knowledge base about sex" and "understands the physiological consequences of sexual intercourse to the extent that she utilizes birth control."

¶29 Keeton and McDonald's secured separate counsel and each moved independently for summary judgment on Saucier's tort claims. In response, the District Court entered separate orders granting summary judgment in favor of both Keeton and McDonald's, concluding that Saucier's tort claims are barred by the Montana Human Rights Act.

¶30 Additionally, Keeton and McDonald's each moved independently for summary judgment on Saucier's gender discrimination claim and her disability discrimination claim. The District Court then issued an order granting summary judgment on the merits in favor of McDonald's, and another order denying Keeton's motion. Subsequently, with the only remaining causes of action being the two discrimination claims against Keeton, he entered into a written agreement with Mallory whereby he stipulated to an entry of judgment in Saucier's favor. Thus, the District Court entered judgment against Keeton for the amount he and Mallory agreed upon, which was $500,000.00.

¶31 Mallory now appeals the District Court's orders granting summary judgment on Saucier's tort claims in favor of McDonald's and Keeton, as well as the order granting summary judgment on her discrimination claims against McDonald's.

## STANDARD OF REVIEW

¶32 We conduct de novo review of summary judgment orders, performing the same analysis as does a district court pursuant to Rule 56 of the Montana Rules of Civil Procedure. *LaTray, v. City of Havre*, 2000 MT 119, ¶ 14, 299 Mont. 449, ¶ 14, 999 P.2d 1010, ¶ 14.

¶33 Summary judgment may be granted only when there is a complete absence of genuine issues of material fact and the moving party is entitled to judgment as a matter of law. M. R. Civ. P. 56(c); *LaTray*, ¶ 14. To determine whether genuine issues of material fact exist, we consider "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any." M. R. Civ. P. 56(c). In doing so, we must view all evidence in the light most favorable to the non-moving party. *LaTray*, ¶ 15. Thus, as we have held, all reasonable inferences that may be drawn from the evidence must be drawn in favor of the party opposing summary judgment. *LaTray*, ¶ 15.

¶34 The party seeking summary judgment bears the initial burden of establishing a complete absence of genuine issues of material fact. *LaTray*, ¶ 14. To satisfy this burden, the moving party must "exclude any real doubt as to the existence of any genuine issue of material fact" by making a "clear showing as to what the truth is." *Toombs v. Getter Trucking, Inc.*, 256 Mont. 282, 284, 846 P.2d 265, 266 (1993). If the moving

14

party satisfies this requirement, the burden then shifts to the non-moving party to set forth specific facts, not merely denials, speculation, or conclusory statements, in order to establish that a genuine issue of material fact does indeed exist. M. R. Civ. P. 56(e); *LaTray*, ¶ 14. Finally, if no genuine issues of material fact exist, it must then be determined whether the facts actually entitle the moving party to judgment as a matter of law. M. R. Civ. P. 56(c).

## DISCUSSION

¶35 **(1) Did the District Court err in concluding that Saucier's tort claims are barred as a matter of law?**

¶36 The district court concluded that Saucier's tort claims were barred by the exclusivity provision of the Montana Human Rights Act ("MHRA"). In connection with this ruling, we review the salient provisions of the MHRA.

¶37 Title 49 of the Montana Code, which has come to be known as the MHRA, declares that the right to be free from discrimination on the basis of one's gender or mental disability, among other attributes including race, age, and religion, "is recognized as and declared to be a civil right." Section 49-1-102(1), MCA. Pursuant to this declaration, the MHRA prohibits particular types of discrimination in various settings such as employment, education, and public accommodations, among others. Sections 49-2-303 to 49-2-309, MCA.[1]

---

[1] Because many portions of the MHRA have been revised since its enactment, we note here that all statutory references in this Opinion are to the 2001 version of the MHRA, which was in effect during the time period relevant to this case. *See Boettcher v. Montana Guaranty Fund*, 2007 MT 69, ¶ 14, 336 Mont. 393, ¶ 14, 154 P.3d 629, ¶ 14.

¶38 With respect to the employment setting, the MHRA defines unlawful discrimination with general terms and also by listing specific prohibited acts. In general terms, unlawful discrimination in employment is statutorily defined as the practice of making distinctions in "a term, condition, or privilege of employment" based on attributes such as age, gender, or mental disability, when the reasonable demands of the position do not require such distinction. Section 49-2-303(1)(a), MCA. The MHRA also designates particular conduct in employment as unlawfully discriminatory, such as differentiating in employees' compensation based on race, refusing to employ an individual based on his or her religious beliefs, and utilizing an employment application that expresses a limitation as to age when the limitation is not based on a bona fide occupational qualification. Section 49-2-303(1)(a), (c), MCA. While this statutory definition of unlawful discrimination in employment has not been legislatively altered in relevant part since its enactment, it has been expanded by the decision in *Harrison v. Chance*, 244 Mont. 215, 220-23, 797 P.2d 200, 203-05 (1990), where this Court held that "sexual harassment," including some forms of tortious conduct motivated by discriminatory intent, is a form of sexual discrimination.

¶39 In conjunction with its anti-discrimination provisions, the MHRA establishes procedures and remedies, separate from tort law, for legal redress of conduct which falls within the definition of unlawful discrimination. The Legislature has mandated that this remedial scheme is the exclusive means of legal redress for unlawful discrimination.[2]

---

[2] This exclusivity provision has not been legislatively altered in relevant part since its enactment in 1987.

Section 49-2-509(7), MCA. Consequently, a plaintiff subjected to acts which constitute unlawful discrimination in employment may not maintain a traditional tort action based on that conduct; rather, the plaintiff is limited to the specific procedures and remedies established in the MHRA. *Harrison*, 244 Mont at 220, 797 P.2d at 203. To provide context for our discussion here, we now review some of the primary elements of this statutory scheme.

¶40 Among other things, this exclusive remedial scheme requires that allegations of unlawful discrimination in employment must be brought in a complaint filed with the Human Rights Bureau of the Department of Labor and Industry ("Department") within 180 days after the alleged unlawful discriminatory practice occurred or was discovered. Section 49-2-501(1), (4)(a), MCA; Admin. R. M. 24.8.201(1).

¶41 A timely filed complaint triggers an investigation by the Department. Section 49-2-504(1)(a), MCA. If the Department determines that the allegations are supported by a preponderance of the evidence, it must "attempt to achieve a resolution of the complaint by conference, conciliation, and persuasion." Section 49-2-504(1)(a), MCA. If those efforts are unsuccessful, the Department must then hold an administrative hearing on the complaint. Section 49-2-505(1), MCA. After the hearing, if the Department finds that unlawful discrimination has in fact occurred, it must issue an order directing the accused party to refrain from such discriminatory conduct. Section 49-2-506(1), MCA. In addition, the Department is vested with the authority to:

(a) prescribe conditions on the accused's future conduct relevant to the type of discriminatory practice found;

(b)  require any reasonable measure to correct the discriminatory practice and to rectify any harm, pecuniary or otherwise, to the person discriminated against;

(c)  require a report on the manner of compliance.

Section 49-2-506(1), MCA.  Punitive damages are not available.  Section 49-2-506(2), MCA.[3]

¶42    Thereafter, a party may appeal to the Human Rights Commission which, after an administrative hearing, may dismiss the complaint or grant any of the same components of relief which the Department is authorized to grant.  Sections 49-2-505(4), 49-2-506, 49-2-507, MCA.  Then a party may commence a civil action in district court.  Section 49-2-509(5), MCA.  However, this type of civil action "may not be entertained by a district court other than by the procedures specified" in the MHRA.  Section 49-2-509(6), (7), MCA.  Thus, a discrimination claim in district court may not be tried before a jury because the MHRA provides for only a "contested case hearing" conducted in accordance with the Montana Rules of Civil Procedure.  Sections 49-2-505, 49-2-509, MCA; *Vainio v. Brookshire*, 258 Mont. 273, 276-77, 852 P.2d 596, 599 (1993).  Additionally, if the district court does conclude that unlawful discrimination has occurred, it may not grant any relief other than that which the Department or the Human Rights Commission are authorized to grant pursuant to § 49-2-506, MCA.[4]  Section 49-2-509(6), (7), MCA.

---

[3]  The MHRA provides one exception to this rule, allowing district courts to assess limited punitive damages for repeated violations of housing discrimination law.  Section 49-2-510(6), MCA.

[4]  The MHRA provides one exception to this rule, allowing district courts to award reasonable attorney fees to the prevailing party.  Section 49-2-509(6), MCA.

¶43 Conversely, if the Department initially determines that the allegations of unlawful discrimination are not supported by a preponderance of the evidence, it must dismiss the complaint. Section 49-2-509(3)(c), MCA. The complainant may then seek review with the Human Rights Commission, after which a civil action may be commenced in district court. Section 49-2-509(3)-(5), MCA. Again, however, the case may not be tried before a jury, §§ 49-2-505, 49-2-509(7), MCA; *Vainio*, 258 Mont. at 276-77, 852 P.2d at 599, and the district courts' authority to grant relief in such an action is no greater than the authority of the Department or the Human Rights Commission in the administrative proceedings, § 49-2-509(6), (7), MCA.[5]

¶44 As noted, these procedures and remedies constitute the exclusive means of redress for conduct which falls within the MHRA's definition of unlawful discrimination. Section 49-2-509(7), MCA. That brings us to the first question we must answer to resolve the first issue in this appeal—that is, whether the conduct at issue here falls within the MHRA's definition of unlawful "discrimination."

---

[5] In *Romero v. J & J Tire*, 238 Mont. 146, 151, 777 P.2d 292, 295-96 (1989), the plaintiff argued that because the MHRA does not allow for jury trial, it violates the fundamental constitutional right to jury trial in civil actions, as provided for in Article II, Section 26, of the Montana Constitution. This Court rejected that argument, reasoning that when the Legislature creates new statutory rights, it may also specify a means of adjudication for those rights other than jury trial. *Romero*, 238 Mont. at 151, 777 P.2d at 295-96 (citation omitted). Notably, however, the *Romero* decision was rendered before the *Harrison* decision expanded the MHRA's definition of discrimination to include some forms of tortious conduct which have always been vindicated by way of jury trial. Of course, it is not only plaintiffs who would seek a jury trial where a discrimination claim proceeds to district court. For example, in *Vainio*, 258 Mont. at 275-81, 852 P.2d at 598-601, where the Human Rights Commission issued a compensatory award of $20,000.00 for damages arising from sexual harassment, the defendant then argued on appeal, like the plaintiff did in *Romero*, that the MHRA is unconstitutional because it does not allow for jury trial. This Court declined to declare the MHRA unconstitutional on that basis, rendering a cursory analysis relying on *Romero* which had already rejected such an argument (albeit prior to the *Harrison* decision). *Vainio*, 258 Mont. at 276-77, 852 P.2d at 599.

¶45 In the proceedings below, the District Court determined that Keeton's alleged conduct amounted to "sexual harassment." Thus, because "sexual harassment" is a form of sexual discrimination prohibited by the MHRA, *Harrison*, 244 Mont. at 221, 797 P.2d at 204, and because the MHRA's remedial scheme provides the exclusive means of redress for sexual discrimination in employment, § 49-2-509(7), MCA, the District Court concluded that Saucier's tort claims are barred as a matter of law.

¶46 On appeal, McDonald's argues that the gravamen of Saucier's complaint is "sexual harassment," and thus the MHRA's exclusivity provision bars any tort action based on Keeton's alleged acts, just as the District Court concluded. In support of this argument, McDonald's cites our decisions in *Harrison*, *Bruner v. Yellowstone County*, 272 Mont. 261, 263-64, 900 P.2d 901, 903 (1995), and *Arthur v. Pierre Ltd*., 2004 MT 303, 323 Mont. 453, 100 P.3d 987. Conversely, Mallory argues that Keeton's conduct went far beyond mere "sexual harassment" prohibited by the MHRA. In support of this argument, Mallory distinguishes the conduct at issue in *Harrison*, *Bruner*, and *Arthur*, and asserts that Keeton's actions amount to criminal assault. We now turn to these cases.

¶47 In *Harrison*, the plaintiff filed an action in district court, alleging that her male employer had subjected her to repeated "unwelcome sexual advances" and "sexually explicit innuendos and offers"; that on one occasion he "forcefully kissed her against her will"; and that he ultimately demanded "she either 'put out or get out.'" *Harrison*, 244 Mont. at 218, 223, 797 P.2d at 202, 205. Based on these allegations, the plaintiff asserted various tort claims, including battery and intentional infliction of emotional distress. *Harrison*, 244 Mont. at 223, 797 P.2d at 205.

20

¶48 In attempting to distinguish her employer's conduct from the type of conduct prohibited by the MHRA, the plaintiff argued that the "alleged acts were sexual harassment, not sexual discrimination." *Harrison*, 244 Mont. at 220, 797 P.2d at 203. We held that sexual harassment is a form of sexual discrimination prohibited by the MHRA. *Harrison*, 244 Mont. at 221, 797 P.2d at 204. In rendering this holding, we reasoned: "When sexual harassment is directed at an employee solely because of gender, the employee is faced with a working environment fundamentally different from that faced by an employee of the opposite gender. That difference constitutes sexual discrimination in employment." *Harrison*, 244 Mont. at 221, 797 P.2d at 204 (internal citation omitted).

¶49 We then observed that sexual harassment can be framed in terms of numerous tort theories, and stated that this Court will not condone "such recharacterization [by tort terminology] of what is at heart a sexual discrimination claim." *Harrison*, 244 Mont. at 223, 797 P.2d at 205. Finally, while acknowledging the tortious nature of the employer's alleged acts, we ultimately focused on the "gravamen" of the complaint and thereby determined that the alleged conduct amounted to sexual harassment prohibited by the MHRA. *Harrison*, 244 Mont. at 222-23, 797 P.2d at 205. Consequently, we held that the MHRA's exclusivity provision applied—i.e., that the plaintiff's sole means of recourse was through the MHRA's remedial scheme and she was therefore barred from pursuing a tort action in district court. *Harrison*, 244 Mont. at 223, 797 P.2d at 205.

¶50 In *Bruner*, a secretary for the Yellowstone County Attorney's Office filed an action in district court alleging that she had been subjected to sexual harassment by a

21

male deputy county attorney, and asserting a tort claim of negligent retention.[6] *Bruner*, 272 Mont. at 264, 900 P.2d at 903. The alleged conduct at issue was what we described as "unprofessional behavior" of a sexually harassing nature for which the perpetrator was required to attend a sexual harassment seminar and barred from spending time alone with the plaintiff at work. *Bruner*, 272 Mont. at 265-66, 900 P.2d at 904. As in *Harrison*, we looked to the gravamen of the complaint and concluded that "sexual harassment is at the foundation of her claim of negligent retention." *Bruner*, 272 Mont. at 267, 900 P.2d at 905. Thus, in accordance with *Harrison*'s holding that sexual harassment is a form of sexual discrimination prohibited by the MHRA, we concluded that the MHRA's exclusivity provision applied and the plaintiff was therefore barred from pursuing a tort claim in district court. *Bruner*, 272 Mont. at 267, 900 P.2d at 905.

¶51 In *Arthur*, the plaintiff, Amber Arthur ("Arthur"), was employed as a dining-room waitress at a hotel. *Arthur*, ¶ 6. She filed an action in district court alleging that one of her male co-workers, James Kennedy ("Kennedy"), had harassed her in various ways. *Arthur*, ¶¶ 6, 12. Specifically, she alleged that Kennedy had made inappropriate comments to her regarding her body and her personal relationship with her boyfriend; that he followed her about the dining room while she worked; that he had restricted her movement on occasion by cornering her in the dining-room office or behind the bar; and that he "slapped her on the buttocks" in one instance. *Arthur*, ¶¶ 8, 25. Additionally, Arthur alleged that Kennedy had similarly pursued her while away from work by, among

---

[6] The plaintiff also brought a claim for battery, but later conceded to dismissal of that claim during summary judgment proceedings.

other things, following her around town and appearing at her second job to bring her gifts. *Arthur*, ¶¶ 8-9. Based on these allegations, Arthur asserted the following causes of action: "(1) failure to provide a safe place to work, (2) negligent retention of Kennedy, (3) negligent supervision of Kennedy, (4) intentional infliction of emotional distress, (5) negligent infliction of emotional distress, and (6) sexual harassment under the Montana Human Rights Act." *Arthur*, ¶ 12.

¶52 In support of her tort claims, Arthur attempted to distinguish the alleged acts from the type of conduct that falls within the MHRA's definition of sexual discrimination. *Arthur*, ¶ 18. In doing so, she argued that Kennedy's conduct was "different-in-kind and distinct from sexually discriminatory conduct," and that she "suffered injuries and damages of a greater degree than those typically stemming from workplace sexual harassment." *Arthur*, ¶ 18. Arthur also argued that "Kennedy's actions went beyond mere sexual harassment, escalating to criminal conduct such as sexual assault, stalking and intimidation." *Arthur*, ¶¶ 18, 25.

¶53 In response, we adhered to our approach in *Harrison* and *Bruner*, examining the nature of Arthur's factual allegations to determine the gravamen of her complaint. *Arthur*, ¶¶ 25-26. In doing so, we referred to language from *Harrison* indicating that sexual harassment can consist of unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature. *Arthur*, ¶ 25 (citing *Harrison*, 244 Mont. at 221, 797 P.2d at 203). On that basis, we determined that Kennedy's alleged acts amounted to verbal and physical conduct of a sexual nature which constitutes sexual harassment prohibited by the MHRA. *Arthur*, ¶ 25.

23

¶54 As for the argument that Kennedy's acts constituted "criminal conduct," we reasoned: "the fact that sexually harassing conduct also may constitute criminal conduct does not necessarily mean that it is not sexual discrimination as contemplated by the MHRA." *Arthur*, ¶ 25. In support of this rationale, we noted that this Court found the forcible kissing in *Harrison* to be "sexual harassment" contemplated by the MHRA even though it could have been deemed sexual assault. *Arthur*, ¶ 25 (citing *Harrison*, 244 Mont. at 223, 797 P.2d at 205). We also noted:

> much of the conduct she alleges in support of her assertion that Kennedy's conduct was criminal in nature occurred after her employment with the [hotel] ended. This includes Kennedy's appearing outside her home, driving by her home at night and following her around town while she attended to personal and work-related activities, as well as being arrested for violating several restraining orders she obtained after she left the [hotel's] employ.

*Arthur*, ¶ 26.

¶55 Upon this analysis, we concluded that the alleged discriminatory conduct which occurred in the workplace—as opposed to that occurring after Arthur left her employment—did not constitute more than "mere sexual harassment" prohibited by the MHRA. *Arthur*, ¶ 26. Thus, because the MHRA exclusivity rule mandates that recourse for "sexual harassment" may only be pursued through the MHRA remedial scheme, Arthur was barred from pursuing tort claims. *Arthur*, ¶ 27.

¶56 While these cases do not provide a comprehensive definition of "sexual harassment" prohibited by the MHRA's anti-discrimination provisions, they do provide general principles which aid in identifying the types of conduct properly characterized as such. First, "sexual harassment" includes some tortious conduct, such as "unwelcome

24

sexual advances" and some forms of "verbal or physical conduct of a sexual nature." *Arthur*, ¶ 25. Second, "sexual harassment" also includes some conduct that may be considered criminal in nature. *Arthur*, ¶ 25. Third, we have consistently looked to the nature of the acts alleged by the plaintiff, as opposed to the manner in which the complaint is framed, to determine the "gravamen" of the complaint. Our "gravamen" determination is made irrespective of the manner in which the complaint is framed because we realize that litigants can frequently employ tort terminology to improperly re-characterize "what is at heart a sexual discrimination claim." *Harrison*, 244 Mont. at 223, 797 P.2d at 205; *Arthur*, ¶¶ 25-27. Similarly, we also recognize that litigants may employ MHRA terminology to erroneously re-characterize a tort claim as a discrimination claim.

¶57 Thus, the bottom line is that the gravamen depends on the nature of the alleged conduct, and not upon the technical format of the complaint or procedural aspects of the case. This Court has, without exception, conducted the gravamen analysis with no regard for whether or not the plaintiff first pressed the claim as a MHRA action. *See e.g., Harrison,* 244 Mont. at 218, 223, 797 P.2d at 202, 205 (plaintiff initially pursued her claim by way of a tort action in district court, and we later concluded it was a discrimination claim); *Bruner,* 272 Mont. at 264-67, 900 P.2d at 903-05 (plaintiff first brought a discrimination claim pursuant to MHRA procedures, and then filed a tort action in district court); *Shields v. Helena School District No. 1,* 284 Mont. 138, 140-41, 149-50, 943 P.2d 999, 1000, 1005-06 (plaintiffs initially pursued a tort action in district court, alleging disparate treatment by a school; we concluded it was a discrimination claim);

25

*Arthur*, ¶¶ 7, 9-12 (plaintiff first filed a discrimination claim pursuant to MHRA procedures, and then filed a tort action in district court).

¶58    As the foregoing precedent suggests, therefore, the fact that a claimant first characterizes the subject conduct as discrimination and pursues a MHRA action does not of itself establish conclusively what the gravamen of the claim actually is—the gravamen analysis has been the province of the court before which the question is ultimately presented.

¶59    With the foregoing principles in mind, we now turn to the case before us.

¶60    At the outset, we address several preliminary matters.  First, we address a contention regarding the $500,000.00 consent judgment against Keeton.  Mallory argues this Court should "hold that McDonald's, as Keeton's employer, is responsible for the judgment entered against Keeton."  We decline to do so because the District Court has not yet reached this issue and therefore has not taken any action which this Court could affirm or reverse.  Arguments on this issue are properly presented to the District Court in the first instance.  Accordingly, we will not address this argument further.

¶61    Second, McDonald's asserts that Mallory has failed to appeal the District Court's order granting summary judgment to Keeton on Saucier's tort claims.  We reject this argument because Mallory filed a Notice of Appeal which expressly states that she appeals the District Court's order granting partial summary judgment in favor of Keeton.  Moreover, in accordance with her Notice of Appeal, Mallory's arguments in her briefing to this Court substantively address Saucier's tort claims against both McDonald's and Keeton, and they are the same arguments presented to the District Court.

¶62　Third, we note that the Complaint Mallory filed in District Court asserted several tort claims, including the tort of "assault," while also referring to Keeton's conduct as a "sexual assault and battery." The tort of assault is distinct from the tort of battery. As provided in the Montana Pattern Instructions, which are modeled after the *Restatement (Second) of Torts*, the tort of battery is "an intentional contact by one person with the person of another which is harmful or offensive," while the tort of assault is "any intentional *threat* of harmful or offensive contact with another by force under circumstances which create a well founded fear of such contact, coupled with the apparent present ability to carry out the threat." M.P.I.2d 9.01 (emphasis added) (citing *Restatement (Second) of Torts* §§ 13-34 (1965)). Mallory has not alleged or cited any evidence that Keeton ever communicated a *threat* of harmful or offensive contact or that Saucier was ever put in fear of such contact. However, the allegations and evidence do support a claim of battery.

¶63　It is well established that although harmful or offensive contact may constitute a battery, effective consent to such contact will bar recovery in tort. *Restatement (Second) of Torts* § 892A(1). However, to be effective, the consent must be rendered by one who has the capacity to consent—i.e., the capability to appreciate the nature, extent, and probable consequences of the conduct. *Restatement (Second) of Torts* § 892A(2) cmt. b.[7] Here, Mallory alleged that Keeton's sexual conduct with Saucier was intentional, harmful, and offensive, and that Saucier's disability precluded her from

---

[7] Although "no one suffers a legal wrong as the result of an act to which [he or she] freely consents," there are "persons whom the law protects for reasons of policy, such as those who are mentally immature or otherwise incompetent." *Restatement (Second) of Torts* § 892A(1) cmt. a.

27

effectively consenting to it. Thus, for the purposes of our analysis on appeal, this allegation will be considered as a claim for the tort of battery.

¶64 As for Saucier's additional tort causes of action, the Complaint asserted claims for negligent supervision, failure to provide a safe workplace, "breach of fiduciary (custodial) duty," negligent and intentional infliction of emotional distress, and "*respondeat superior*." As Mallory has conceded, the first three claims are directed at McDonald's, and not Keeton. The remaining tort claims (in addition to battery) are negligent and intentional infliction of emotional distress and "*respondeat superior*." We note that *respondeat superior* is not a free-standing or independent tort cause of action; rather, it is a doctrine of the law of agency by which the consequences of one person's actions may be attributed to another person. *Restatement (Third) of Agency* § 2.01 Introductory Note (2006); *Kornec v. Mike Horse Mining & Milling Co.*, 120 Mont. 1, 7-8, 180 P.2d 252, 256 (1947); *Vainio*, 258 Mont. at 279, 852 P.2d at 600 (1993). Thus, this "claim" is not amenable to summary disposition as a stand-alone tort cause of action. It will be up to the District Court on remand to determine the merits of the theory's application in this case.

¶65 Next, pursuant to the applicable standard of review, we explain our assessment of the facts regarding the extent of Saucier's disability. The litigants zealously dispute this issue. However, because McDonald's is the party seeking to preclude a trial on the merits, we must view the facts in a light most favorable to Saucier, and we must draw all reasonable inferences in her favor. *LaTray*, ¶ 15. We have consistently followed this approach because summary judgment is an extreme remedy which should never

substitute for a trial on the merits if a material factual controversy exists. *Delaware v. K-Decorators, Inc.*, 1999 MT 13, ¶ 55, 293 Mont. 97, ¶ 55, 973 P.2d 818, ¶ 55.

¶66     At the heart of this case is the factual allegation that Saucier's disability precluded her from effectively consenting to the sexual conduct of her supervisor, Keeton, in the employment setting.  In support of this allegation, Mallory cites, inter alia, evidence of Saucier's documented history as a mentally disabled individual; evidence of her limited IQ and limited level of "adaptive functioning"; evidence that her disability puts her at risk of sexual exploitation; and Dr. Sheppard's conclusion that Saucier possesses an "extremely limited capacity" to appreciate the consequences attendant to a sexual relationship.  In contesting this allegation, McDonald's cites, inter alia, evidence that Saucier "functions very independently" by cooking her own meals and doing her own laundry at times; evidence that she received sex education while living in a group home; evidence that she has previously engaged in sexual relationships;[8] and Dr. English's conclusion that Saucier "commands a basic understanding and knowledge base about sex" and "understands the physiological consequences of sexual intercourse to the extent that she utilizes birth control."

¶67     Viewing the conflicting evidence in a light most favorable to Saucier,[9] and drawing all reasonable inferences in her favor, we conclude that McDonald's has failed to carry its burden of establishing a complete absence of material factual issues regarding

---

[8]  We express no opinion as to whether evidence of any previous sexual relationship would be admissible at trial.

[9]  We recognize that it is somewhat ludicrous to identify evidence of Saucier's disability as "favorable" to her.  We use this terminology here only in the sense that such evidence is favorable with respect to her limited guardian's effort to obtain legal redress on Saucier's behalf.

Saucier's ability to effectively consent. Specifically, we conclude a jury could reasonably find that Saucier's mental disability precluded her from effectively consenting to sexual conduct with a supervisor in an employment setting, particularly a supervisor with authority over her work schedule. Of course, the contrary evidence relied upon by McDonald's could ultimately be persuasive to a jury. The point is that for purposes of summary judgment analysis, there is a genuine issue of material fact regarding Saucier's ability to effectively consent, precluding summary disposition of this issue.

¶68 Next, it is our task to determine what the gravamen of Saucier's claim actually is. Again, construing the facts in Saucier's favor, as we must do at this stage of the proceedings, we start with the proposition that the conduct complained of is non-consensual sex. The grave nature of this conduct sets it far apart from anything we have previously held to constitute "sexual harassment" under the MHRA. While the spectrum of conduct noted above covers a broad range of acts, including even some assaultive conduct, to hold that those acts stand on the same footing as non-consensual sex would profoundly minimize the grievous nature of such conduct. Thus, we conclude that comparison to the conduct in our previous cases provides no basis for holding that non-consensual sex falls within the definition of "sexual harassment" contemplated by the MHRA's anti-discrimination provisions.

¶69 In this connection, we note the disparity between the criminal penalties for "discrimination" under the MHRA and the criminal penalties for sexual intercourse without consent. The MHRA designates unlawful discrimination in employment as a misdemeanor criminal offense punishable by no more than six months of imprisonment

30

and a fine of no more than $500.00. Section 49-2-601, MCA. Conversely, under Title 45 it is a felony offense to knowingly have sexual intercourse with a person whose mental condition renders him or her incapable of consent. Sections 45-5-503(1), 45-5-501(1)(b)(i), 45-2-101(39), MCA. Reflecting the gravity of such conduct, our law requires a punishment of no less than two years imprisonment for this offense, and up to a life term of imprisonment and a maximum fine of $50,000.00. Section 45-5-503(2), MCA. While we are not faced here with a criminal prosecution, nonetheless the stark contrast between the statutory penalties underscores the significant distinction between the two categories of offense.

¶ 70 Simply put, nothing in the statutory scheme or our precedent supports the notion that non-consensual sex falls within the MHRA's definition of discrimination. As such, it is apparent that we would have to drastically expand that definition in order to hold that it encompasses the conduct at issue here. While McDonald's would have us do so, it fails to support such an undertaking. We are, after all, required to construe the definition of discrimination by viewing it in light of the statutory scheme in which it resides. *State v. Branam*, 2006 MT 300, ¶ 15, 334 Mont. 457, ¶ 15, 148 P.3d 635, ¶ 15. McDonald's offers no explanation as to how such a revision of the definition of discrimination would be consistent with the rest of the MHRA.[10] More importantly, McDonald's offers no

---

[10] Even a cursory review of the statutory scheme reveals that serious questions could arise in this regard. For example, the MHRA mandates that, as the initial requirement in addressing a properly supported claim of unlawful discrimination, officials with the Department of Labor and Industry must attempt to resolve the issue by way of "conference, conciliation, and persuasion." Section 49-2-504(1)(a), MCA. Suffice it to say, we have difficulty imagining that the

legal authority that would justify such judicial interference with the statutory scheme. In fact, expanding the MHRA's definition of discrimination in this manner would directly violate one of the most basic precepts governing this Court's function—the long-standing mandate that we must not insert what the Legislature has omitted. Section 1-2-101, MCA. In short, there is no basis for this Court to insert conduct such as non-consensual sex into the MHRA's definition of discrimination in employment.

¶71 In summary, we conclude that non-consensual sex goes beyond any reasonable conception of "sexual harassment" and falls outside the MHRA's definition of "discrimination" in employment. Simply put, allegations of non-consensual sex sound in tort and not in discrimination.

¶72 Next, we address whether the District Court erred in concluding that Mallory's tort claims were barred under the exclusivity provision of the MHRA. Here, Mallory initially brought this claim as a discrimination action and thus filed it with the Department. However, we have determined that her claim sounds in tort and not discrimination. The question of whether Mallory may therefore proceed with a tort action in district court presents a conundrum which we will address in general and then specific terms, in the hopes of giving some instruction to the practitioner who must wade through this forum mine field.

¶73 In general terms, the question presented is this: If the Department concludes there is no cognizable discrimination claim, or if the reviewing court determines that the

_____

Legislature envisioned "conference, conciliation, and persuasion" as legitimate means of addressing non-consensual sex.

gravamen of the case before it is not tort but is, rather, discrimination, may the litigant then pursue the other option? The answer to this question is a qualified yes. Provided the alternative claim or complaint is filed within the applicable law, including the statute of limitations, and provided the discrimination claim does not sound in tort or the tort claim in discrimination, the alternative case is not barred. Our recent decision in *Vettel-Becker v. Deaconess Medical Center*, 2008 MT 51, ___ Mont. ___, ___ P.3d ___ is instructive.

¶74 In *Vettel-Becker*, the plaintiff pursued an employment discrimination claim under the MHRA after he was discharged from employment by Deaconess. *Vettel-Becker*, ¶¶ 2, 23. However, only a few days later, he filed a complaint in district court alleging that his discharge was not for good cause. *Vettel-Becker*, ¶¶ 2, 23. Ultimately, the Department dismissed his claim. *Vettel-Becker*, ¶¶ 2, 23. Vettel-Becker then proceeded with his wrongful discharge claim in district court. *Vettel-Becker*, ¶¶ 2, 23. Deaconess moved for and was awarded summary judgment, the court concluding, among other things, that the MHRA provided the exclusive remedy for his discharge and discrimination claims because he raised the same facts in support of both claims. *Vettel-Becker*, ¶ 24. Vettel-Becker appealed the dismissal of his wrongful discharge claim and we reversed and remanded for a trial on the merits. *Vettel-Becker*, ¶ 25.

¶75 Pertinent to the case before us, we said in *Vettel-Becker* that, where a discrimination claim is disallowed, the claimant may pursue relief in the district court (in *Vettel-Becker*, the relief sought was under the Wrongful Discharge from Employment Act ("WDEA")), "provided that claim is not premised upon 'underlying allegations of . . . discrimination.' " *Vettel-Becker*, ¶ 37 (quoting *Arthur*, ¶ 18). Concluding that

33

Vettel-Becker's WDEA claim was not grounded in discrimination, we held that the district court erred in granting summary judgment to Deaconess on the grounds of MHRA exclusivity. *Vettel-Becker*, ¶¶ 37, 46. Arguably, the converse would also be true: If a claim is filed in district court, sounding in tort, and the court concludes that the claim is grounded in discrimination, then a claim for discrimination before the Department would not be barred, provided of course that the claimant complies with the statute of limitations which governs MHRA actions.

¶76 Our rationale in *Vettel-Becker* applies here. While Mallory sought relief for discrimination in the Department, she also sought relief subsequently in the District Court for tortious conduct. When the Human Rights Bureau concluded she did not state a cognizable claim for discrimination, Mallory was then free to pursue relief for the defendants' alleged tortious conduct in district court, as long as her claim there was not grounded upon underlying allegations of discrimination. *Vettel-Becker*, ¶ 37. As we conclude here above, Mallory's claim of non-consensual sex is grounded not in discrimination, but in tort. Therefore, she is not barred from proceeding in district court. As we noted in *Vettel-Becker,* a contrary conclusion under such circumstances would result in a denial of any procedure or remedy for Mallory's dispute. *Vettel-Becker*, ¶ 36 (citing *Schultz v. Stillwater Mining Co.*, 277 Mont. 154, 157, 920 P.2d 486, 487-88 (1996)). Accordingly, we hold that the District Court erred in concluding that Saucier's tort claims against Keeton and McDonald's are barred by the MHRA's exclusivity provision.

¶77 **(2) Did the District Court err in concluding that McDonald's sufficiently established an affirmative defense to Saucier's discrimination claims?**

¶78 As noted above, in addition to the tort claims, Mallory asserted, on Saucier's behalf, claims of gender discrimination and disability discrimination against both Keeton and McDonald's. The District Court denied Keeton's motion for summary judgment on these claims, and he thereafter stipulated to the entry of judgment in Saucier's favor. However, the court granted McDonald's motion for summary judgment on Saucier's discrimination claims. In doing so, the court relied on federal case law and concluded that McDonald's had sufficiently established an affirmative defense by taking reasonable preventive and remedial steps to address discrimination at the restaurant. Given our resolution of the first issue in this appeal, we need not address the court's reasoning. As we have held, this Court will affirm a district court which reaches the correct result, regardless of the district court's reasoning. *Estate of Bovey*, 2006 MT 46, ¶ 9, 331 Mont. 254, ¶ 9, 132 P.3d 510, ¶ 9.

¶79 As noted above, in determining whether a plaintiff has stated a tort claim or a discrimination claim, we look to the gravamen of the complaint. *See e.g. Harrison*, 244 Mont. at 223, 797 P.2d at 205. When the gravamen is ascertained, the complaint is thereby designated as either a tort action or a discrimination action. If the alleged conduct falls outside the MHRA's definition of unlawful discrimination, the plaintiff may maintain a tort action. However, because the MHRA establishes the exclusive means of legal redress for unlawful discrimination, § 49-2-509(7), MCA, the plaintiff may not simultaneously proceed in district court with a discrimination claim based on the same

35

allegations when it is determined that the complaint sounds in tort. *Harrison*, 244 Mont. at 223, 797 P.2d at 205; *Arthur* ¶¶ 12, 27.

¶80 Here, as we have concluded above, the alleged conduct goes beyond the type of discriminatory actions contemplated by the MHRA. Thus, Mallory may maintain tort claims on Saucier's behalf in the District Court. However, given the exclusivity provision of the MHRA, Mallory may not simultaneously proceed in the District Court with a discrimination claim on Saucier's behalf based on the same allegations.

¶81 On this basis, then, we conclude the District Court appropriately granted summary judgment on Saucier's discrimination claims. Because the court reached the correct result, we need not address its application of federal precedent with respect to the merits of Saucier's discrimination claims. *Estate of Bovey*, ¶ 9.

## CONCLUSION

¶82 We affirm the District Court's order granting summary judgment on Saucier's discrimination claims. We reverse the District Court's orders granting summary judgment on Saucier's tort claims against both Keeton and McDonald's, and we remand for further proceedings.

/S/ PATRICIA COTTER

We Concur:

/S/ KARLA M. GRAY
/S/ JAMES C. NELSON
/S/ JOHN WARNER
/S/ W. WILLIAM LEAPHART
/S/ BRIAN MORRIS
/S/ JIM RICE

Justice James C. Nelson concurs.

¶83　Based on existing law, I concur in the Court's Opinion. However, I write separately to note the problems which this Court created in *Harrison v. Chance*, 244 Mont. 215, 797 P.2d 200 (1990).

¶84　The MHRA has always defined unlawful discrimination in employment as the practice of making distinctions "in compensation or in a term, condition, or privilege of employment" based on various attributes such as gender and mental disability when the reasonable demands of the position do not require such distinction. Section 49-2-303(1)(a), MCA. The *Harrison* decision, however, expanded this definition by holding that "sexual harassment" falls within the definition of "sexual discrimination." *Harrison*, 244 Mont. at 221, 797 P.2d at 204. In doing so, this Court reasoned: "When sexual harassment is directed at an employee solely because of gender, the employee is faced with a working environment fundamentally different from that faced by an employee of the opposite gender. That difference constitutes sexual discrimination in employment." *Harrison*, 244 Mont. at 221, 797 P.2d at 204 (internal citation omitted).

¶85　Having thus expanded the definition of "sexual discrimination" to include "sexual harassment," we then categorized the tortious battery at issue as "sexual harassment." *Harrison*, 244 Mont. at 220-23, 797 P.2d at 203-05 (among other things, the plaintiff's employer "forcefully kissed her against her will"). Consequently, some forms of tortious conduct now fall within the definition of "discrimination" prohibited by the MHRA. For example, in *Arthur v. Pierre Ltd.*, 2004 MT 303, ¶ 25, 323 Mont. 453, ¶ 25, 100 P.3d 987, ¶ 25, where the plaintiff's co-worker "slapped her on the buttocks," among other

things, we applied *Harrison* to conclude that the conduct at issue was "sexual harassment" contemplated by the MHRA.

¶86     The *Harrison* decision is problematic because it expanded the statutory definition of "discrimination" drastically and without precision. Consequently, as our Opinion here observes, we have utilized a "gravamen" test to analyze claims where the plaintiff alleges conduct that is both tortious and discriminatory. Opinion, ¶¶ 47-56. However, like *Harrison*'s notion of discrimination, our "gravamen" approach is remarkably ambiguous, as we have been unable to articulate clear standards by which district courts may determine whether a complaint sounds in discrimination or tort. The "gravamen" of a complaint is essentially determined by an "I know it when I see it" type of analysis. *See Jacobellis v. Ohio*, 378 U.S. 184, 197, 84 S. Ct. 1676, 1683 (1964) (Stewart, J., concurring) (suggesting that it may be impossible to formulate an intelligible definition of obscenity, but famously stating "I know it when I see it").

¶87     Of course, these issues are not particularly troubling in the present case because criminal conduct such as non-consensual sex is clearly not a form of "sexual harassment" contemplated by the MHRA's anti-discrimination provisions.[1] However, in other scenarios that are not as clear cut, *Harrison*'s vague and expansive notion of discrimination, together with the ambiguity in our "gravamen" approach, will spawn litigation. And how will district courts know what the gravamen of a complaint is where

---

[1]  As our Opinion indicates, we do not hold that Saucier was in fact unable to effectively consent to the sexual relations with Keeton. Rather, we accept that allegation only for the purposes of summary judgment analysis, based on the applicable standard of review. Opinion, ¶¶ 32-34, 65-68.

38

the conduct alleged is not as egregious as the non-consensual sex alleged here, but it is more egregious than the forceful kissing alleged in *Harrison* or the slapping alleged in *Arthur*?

¶88 Even more problematic are the consequences of the "gravamen" test in some instances. As our Opinion notes, the MHRA procedures do not allow for a jury trial in discrimination claims. Sections 49-2-505, 49-2-509, MCA. Because *Harrison* establishes that some tortious conduct falls within the MHRA's definition of "discrimination," and because MHRA procedures are the exclusive means of redress for unlawful discrimination in employment, some individuals are now denied a jury trial as a means to redress tortious conduct. However, the right to jury trial in civil suits is a constitutional right which "is secured to all and shall remain inviolate." Mont. Const. art. II, § 26. Moreover, the right to trial by jury is a *fundamental* constitutional right and therefore merits the highest level of protection by this Court. *Kloss v. Edward D. Jones & Co.*, 2002 MT 129, ¶ 52, 310 Mont. 123, ¶ 52, 54 P.3d 1, ¶ 52. Thus, in those instances where *Harrison's* broad definition of "discrimination" operates to deprive an individual of a jury trial in redressing tortious conduct, our decision clearly conflicts with the plain language of the Montana Constitution.

¶89 Moreover, *Harrison* creates a paradox with respect to the form of legal relief applicable to similarly situated individuals. As noted, *Harrison* mandates that an employee subjected to some types of tortious conduct is limited to an MHRA discrimination claim. *Harrison*, 244 Mont. at 220-23, 797 P.2d at 203-05. However, because *Harrison* is premised on the presence of some discriminatory intent underlying

39

the tortious conduct, another employee intentionally subjected to the very same tort is not limited to a MHRA claim, but is free to pursue a common-law tort claim, with a jury trial, if the perpetrator did not act with discriminatory motive. This paradox further reveals the flawed nature of *Harrison*.

¶90 I recognize that in *Romero v. J & J Tire*, 238 Mont. 146, 151, 777 P.2d 292, 295-96 (1989), we held that the MHRA's prohibition against jury trial in discrimination claims does not violate the right to trial by jury guaranteed by the Montana Constitution. However, we reached that conclusion before *Harrison* expanded the definition of "discrimination" to include tortious conduct which has traditionally been remedied by way of common-law tort procedures, including trial by jury. Because *Harrison* so dramatically changed the MHRA in this way, the previously-decided *Romero* decision contemplated a statutory scheme which was very different than the MHRA as it exists today—i.e., as judicially modified by *Harrison*. Thus, it is clear that this Court will eventually have to address the validity of *Harrison* in light of the fact that it deprives litigants of their constitutional right to a jury trial in some instances.

¶91 Additionally, we will eventually have to address the fact that *Romero* was based on a false premise. Our holding there—that the MHRA's prohibition against a jury trial in discrimination claims does not violate the constitutional right to a jury trial—was based on the rationale that when the Legislature creates new statutory rights, as with the MHRA, it may also specify a means of adjudication for those rights other than trial by jury. *Romero*, 238 Mont. at 151, 777 P.2d at 295-96 (citation omitted). However, the right to be free from discrimination in employment was *not* a new statutory right created

40

by the Legislature. In fact, this right became a fundamental constitutional guarantee in 1972 when we adopted our state Constitution, which provides: "Neither the state nor any person, firm, corporation, or institution shall discriminate against any person in the exercise of his civil or political rights on account of race, color, sex, culture, social origin or condition, or political or religious ideas."[2] Mont. Const. art. II, § 4.

¶92 Finally, our "gravamen" approach has created unnecessary procedural concerns. Because we have provided only vague guidance for determining the gravamen of a complaint, plaintiffs often have difficulty determining whether to file a tort claim in district court or a discrimination claim with the Department of Labor and Industry. Indeed, it appears in this case that Saucier's counsel initially perceived this as a tort claim; however, as disclosed in briefing, counsel nonetheless filed the MHRA action "out of an abundance of precaution." This problem is further complicated by the MHRA's 180-day statute of limitations for filing a discrimination claim. Section 49-2-501(1), (4)(a), MCA. That is, if a plaintiff incorrectly determines that the gravamen of his or her claim is tort, and thus fails to file a discrimination action within 180 days, the plaintiff will be procedurally barred from bringing the discrimination action even if the claim is later adjudicated as having a gravamen of discrimination. Of course, it makes no sense to penalize a plaintiff with such forfeiture where he or she simply mis-applies the "gravamen" analysis, because we have failed to provide adequate guidance for that undertaking.

---

[2] The opportunity to pursue employment is a fundamental civil right under Article II, Section 3, of the Montana Constitution. *Wadsworth v. State*, 275 Mont. 287, 299, 911 P.2d 1165, 1172 (1996).

¶93 Although a plaintiff may be able to overcome this procedural bar through further litigation (see *Harrison*, 244 Mont. at 228, 797 P.2d at 208, discussing equitable tolling of the MHRA's statute of limitations where a plaintiff has in good faith pursued a tort claim), we should approve simpler means to resolve this issue preemptively—that is, as long as we perpetuate the "gravamen" approach. For example, where a claim arguably sounds in either tort or discrimination, the plaintiff should be allowed to concurrently file a tort claim in district court and a discrimination claim with the Department of Labor and Industry. If the discrimination claim is filed within the applicable 180-day limit, the MHRA proceedings should then be stayed upon request by the plaintiff while he or she seeks a judicial determination as to the gravamen of the claim. In this way, the discrimination claim would be preserved if the gravamen of plaintiff's claim is ultimately adjudged to be discrimination. Moreover, if the gravamen of the claim is tort, the dual filing and the stay would allow the Department to avoid unnecessary MHRA proceedings, thereby preserving state resources. We have previously approved a similar dual-filing approach in cases where it is not initially known whether the applicable law is the MHRA or the Wrongful Discharge from Employment Act. *Tonack v. Montana Bank of Billings*, 258 Mont. 247, 255, 854 P.2d 326, 331 (1993) (allowing for concurrent filing of a MHRA action and a WDEA action, while noting that recovery may only be obtained under one theory or the other).[3]

---

[3] We have also adopted a similar procedure with respect to the relationship between negligence claims and bad faith claims. In *Fode v. Farmers Ins.*, 221 Mont. 282, 287, 719 P.2d 414, 417 (1986), we held that because a bad faith claim against an insurer cannot be prosecuted until after the underlying negligence claim is concluded, the plaintiff may file the bad faith claim while

¶94 It is critical to note that these issues plaguing anti-discrimination law—particularly our redefining of the term "discrimination"—are judicially created problems. While we are obligated to own up to that fact and resolve these issues at some point, I recognize that it is appropriate to treat *Harrison* and its progeny as controlling in this case.

¶95 That said, I can no longer adhere to the legal fiction that sexual assaults or batteries in the work place are "discrimination." The common sense—and legal—definition of discrimination is that which is set forth in § 49-2-303(1)(a), MCA, referred to above. Quite simply, sex discrimination includes making distinctions in jobs, advancement, pay, and other conditions or terms of employment based on gender, instead of on merit or some unique requirement of the job. And, it goes without saying, that most sexual discrimination in the workplace is directed against women by men.

¶96 However, presently, under Montana's jurisprudence, if a male customer of a pizza parlor forcibly kisses a female employee or slaps her buttocks, the employee can sue the customer in tort for, at least, civil battery. Yet, under *Harrison* and its progeny, if the male supervisor of the same employee forcibly kisses her or slaps her buttocks, that is simply workplace "discrimination"—with the result that the employee forfeits fundamental civil rights and remedies, including access to the courts in tort and a jury trial. Opinion, ¶¶ 39-43.

---

concurrently prosecuting the negligence claim, in order to toll the statute of limitations applicable to bad faith claims. However, we held that the bad faith action must be suspended and no discovery proceedings may be conducted while the underlying negligence claim is prosecuted. *Fode*, 221 Mont. at 287, 719 P.2d at 417. Similarly here, we should allow the discrimination claim to be stayed while the plaintiff seeks a judicial determination of the gravamen of the claim.

¶97 This sort of judicially-created legerdemain is, at best, illogical. Worse, characterizing workplace sexual assaults or batteries of women as "discrimination," trivializes the conduct and the female employee's fundamental rights to human dignity and individual privacy guaranteed under Article II, Sections 4 and 10, respectively, of Montana's Constitution. Refusing to acknowledge and name this sort of personal violation and degradation for what it is—a criminal offense and a civil tort—perpetuates the paternalistic view that this sort of behavior is just "boys will be boys" workplace horseplay. *Harrison* and its progeny marginalize female employees and relegate them to the status of second-class citizens. Moreover, this jurisprudence is antithetical to this Court's attempts to encourage gender equity and fairness. A sexual assault or battery is precisely that; it is not discrimination.

¶98 Application of the gravamen test to such conduct is not the solution. Indeed, it is part of the problem. The *Harrison* line of cases should be overruled, and I look forward to the case when that issue is raised, briefed and argued on appeal.

¶99 With that caveat, I concur.


/S/ JAMES C. NELSON


Justice Patricia O. Cotter joins in the Concurrence of Justice James C. Nelson.


/S/ PATRICIA COTTER

44