FILED

03/30/2021

Bowen Greenwood
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 20-0372

DA 20-0372

IN THE SUPREME COURT OF THE STATE OF MONTANA

2021 MT 82

PAULA BUCKLEY,

> Plaintiff and Appellant,

v.

WESTERN MONTANA COMMUNITY MENTAL
HEALTH CENTER, and JOHN DOES 1-10,

> Defendants and Appellees.

APPEAL FROM: District Court of the Eleventh Judicial District,
In and For the County of Flathead, Cause No. DV-19-554(A)
Honorable Amy Eddy, Presiding Judge

COUNSEL OF RECORD:

For Appellant:

Todd. A Hammer, Marcel A. Quinn, Hammer, Quinn & Shaw PLLC,
Kalispell, Montana

For Appellee:

Susan Moriarity Miltko, Tyler C. Smith, Williams Law Firm, P.C.,
Missoula, Montana

Submitted on Briefs: February 24, 2021

Decided: March 30, 2021

Filed:

_____
Clerk

Justice Laurie McKinnon delivered the Opinion of the Court.

¶1　Paula Buckley appeals an order from the Eleventh Judicial District Court, Flathead County, granting Western Montana Community Mental Health Center (WMMHC) summary judgment on Buckley's Wrongful Discharge from Employment Act claim.　We affirm and address the following issue for review:

*Whether the District Court erred in granting WMMHC summary judgment on Buckley's Wrongful Discharge from Employment Act claim.*

## FACTUAL AND PROCEDURAL BACKGROUND

¶2　WMMHC is a nonprofit mental health care corporation that provides mental health care and treatment for patients in western Montana who have serious and disabling mental illnesses.　Because WMMHC is a mental healthcare facility, certain policies and procedures must be followed.　WMMHC cannot permit any form of abuse or neglect of a person admitted to its facilities and is required to implement certain procedures that define guidelines for reporting, investigating, and resolving any abuse or neglect of clients. Sections 53-21-107 and -142, MCA.　WMMHC must implement procedures—here, set forth in the WMMHC Employee Policies Handbook—and provide them to each new employee.　Importantly, WMMHC prohibits the abuse, neglect, or exploitation of clients, and sets forth grounds for immediate termination should any of these abuses occur. WMMHC is also required to afford its clients the right to privacy and dignity, the right to the least restrictive conditions necessary to achieve treatment, the right to visitation and access to telephone communications, the right to maintain possession of personal property,

2

and the right to a humane psychological and physical environment within WMMHC facilities. *See* §§ 53-21-107 and -142, MCA.

¶3 Prior to Buckley's employment with WMMHC, she worked as the program manager for a group home for adolescent girls. Buckley utilized a "level system" where clients were given rules and expectations for living in the group home. Failure to comply with the level system would result in the client losing privileges. In April 2018, the adolescent group home closed due to lack of State funding and Buckley accepted a position as program manager for two WMMHC adult group homes in Kalispell, Montana, where individuals with serious and disabling mental illness resided.

¶4 Before Buckley began at the adult group homes, WMMHC provided her with a document—titled "Functional Job Description"—which she acknowledged and signed. The document described she would primarily be responsible for "providing direct care and guidance to adults with serious and disabling mental illness in therapeutic group home." The document detailed her job duties, which included: supervising residential care workers, promoting treatment plans to support clients, and ensuring compliance of WMMHC policies and procedures with Montana law. The document also described her "essential job duties," which included: commitment to WMMHC's vision, values and mission; knowledge and understanding of residential treatment for adults with serious and disabling mental illness; the ability to work within the framework of a therapeutic milieu; and the ability to exercise sound judgment.

¶5 Shortly after starting her new position, Buckley restructured the level system she used at the youth group home to apply to the adult group homes. The adjustment provided

3

that clients would lose privileges if they earned a certain number of demerits in a week. The new level system (Level System) included certain limitations on clients' phone usage, use of electronics in their room, visits with family and friends, and the ability to possess or keep certain items of personal property. In February 2019, Buckley received her first annual performance review as the program manager for the adult group homes, which indicated her overall performance was satisfactory.

¶6 On April 5, 2019, WMMHC Chief Operating Officer, Natalie McGillen, received a report from the WMMHC operations manager expressing concerns about Buckley's policies and treatment of clients. McGillen reported that Buckley's policies and procedures, embodied by her Level System, adversely affected clients' rights and amounted to abusive acts. That same day, McGillen received a call from the WMMHC clinical coordinator indicating that some of the group homes' policies relating to client care and management were "punitive in nature." McGillen visited the group homes on April 9, 2019, to discuss the concerns with staff members. McGillen also met with Buckley and informed her of the gravity of these complaints and that WMMHC would be commencing an investigation to gather additional information in relation to the concerns.

¶7 On April 10, 2019, McGillen received a list of client complaints from the group homes, including: (1) they were not allowed to return to the group home when they forgot something; (2) they were always escorted by staff to and from the group home; (3) personal belongings, such as cell phones, were confiscated; (4) they were made to perform calisthenics or pay 25 cents if they forgot to pick up belongings in the common-area; (5) they objected to the Level System and demerits, or "challenges"; (6) they never got time

4

off to relax on the weekends and had, instead, mandatory outings and activities; (7) they were not allowed to wear comfort clothing on the weekend; (8) they could not smoke after 10 p.m.; (9) the kitchen was only open during certain hours; (10) staff would gather information from clients to use against a client to issue demerits; (11) staff controlled clients' diets by telling them what they could eat; (12) they had no control over their personal money; (13) they were not allowed to have electronics in bedrooms for the first month; (14) there were forced activities; (15) they were told they had too many personal belongings; (16) they had laundry privileges only on certain days; (17) they could not talk about their mental health symptoms; (18) they were issued a three-day notice of eviction if they swore or screamed at staff; and (19) they could not sleep in on the weekend.

¶8 On May 1, 2019, McGillen received a complaint from a therapist alleging a client had been locked out of the group home for over an hour because he went outside to smoke. Later that day, McGillen received another complaint that clients were afraid to report concerns for fear of retribution or eviction from the group home. On May 3, 2019, WMMHC's Quality and Compliance Manager met with nine group home residents, each of whom expressed concerns about their treatment and the treatment of others. A report was prepared and provided to WMMHC. The report noted the clients' accounts were consistent in indicating that Buckley's Level System used fear and shame to control client behavior. The State of Montana and the Board of Visitors were notified about these concerns on May 6, 2019. *See generally* § 53-21-107, MCA. On May 8, 2019, WMMHC staff members were interviewed regarding the clients' complaints. Staff noted rules implemented by Buckley with which they disagreed, and raised concerns about the punitive

5

nature of Buckley's interactions with group home clients. Additionally, the staff members discussed how the Level System was demoralizing to clients and hampered their recovery process.

¶9 As a result of the investigation, WMMHC determined the concerns warranted Buckley's immediate termination under its discipline policies. On May 14, 2019, Buckley received a Termination Notice discharging her from her duties and position as program manager, and detailing the reasons for her termination. The Notice referred to clients' fear of losing their housing due to infractions and the demoralizing, punitive Level System. The Notice also detailed that Buckley was notified on April 9, 2019, of the complaints made and the impending investigation. WMMHC noted due to the seriousness of the allegations and the investigation's conclusions, immediate termination was warranted under the WMMHC Employee Policies Handbook, and Montana law, to protect the clients in the group homes.

¶10 Buckley met with the WMMHC Executive Director-Human Resources Director to complete an Employee Separation Form, which listed "policy violation" and "client abuse" as the reasons for separation. Buckley appealed her discharge utilizing the three-step internal disciplinary grievance procedure detailed in WMMHC's Employee Policies Handbook.[1] Buckley was denied her Step 1 and Step 2 grievances, resulting in her request

---

[1] Step 1 requires a discussion with the immediate supervisor. The immediate supervisor has five business days to respond in writing to the complaint. If the discussion with the supervisor did not resolve the issue, Step 2 requires submitting a written complaint to the HR Director within five business days. The HR Director has five business days to respond to the written complaint. If there is continued dissatisfaction, within five business days of receiving the written response in Step 2, an employee can appeal the decision, in writing, to the Chief Executive Officer. In Step 3,

6

for a formal meeting under Step 3. WMMHC conducted a conference call with Buckley on May 20, 2019. On May 28, 2019, WMMHC's HR Director emailed the decision letter to Buckley, which concluded that "the progressive process used to investigate, discipline, and discharge Buckley substantively complied with WMMHC policies and procedures and were warranted under the circumstances."

¶11 On June 28, 2019, Buckley filed an action in District Court alleging she was wrongfully discharged because WMMHC terminated her employment without "good cause" and in violation of its written personnel policy within the Policies and Procedures Manual. Buckley subsequently moved for partial summary judgment, alleging the undisputed facts established her termination did not comply with the procedures outlined in the WMMHC Policies and Procedures Manual. In response, WMMHC filed a motion for summary judgment in May 2020. Oral argument was held in July 2020. The District Court issued its final order on July 15, 2020, holding WMMHC satisfied its burden to demonstrate it had good cause for terminating Buckley's employment, and Buckley did not meet her burden of then demonstrating the reason for the termination was: (1) not a job or business related reason; (2) false; (3) not the true reason for discharge; or (4) arbitrary, capricious, or whimsical. Additionally, the District Court held WMMHC met its burden of demonstrating that it did not violate the express provisions of its personnel policy governing employee discipline because client grievances and allegations of abuse and

the CEO has the option to arrange a meeting with any or all parties involved before making a final decision. A final decision is provided within five business days from the receipt of the appeal, or within five business days from the meeting to seek resolution.

neglect are addressed in WMMHC's client grievance procedure within the Employee Policies Handbook. Buckley appeals.

## STANDARD OF REVIEW

¶12 This Court reviews de novo a grant of summary judgment and applies the same method of evaluation as the district court pursuant to Rule 56. *Sullivan v. Cont'l Constr. of Mont., LLC*, 2013 MT 106, ¶ 14, 370 Mont. 8, 299 P.3d 832; *see generally* M. R. Civ. P. 56. "Summary judgment is proper if no genuine issues of material fact exist and the moving party is entitled to judgment as a matter of law." *Sullivan*, ¶ 14. "The party seeking summary judgment [has] the burden of establishing a complete absence of any genuine issues of material fact." *Sullivan*, ¶ 14. When the moving party has met its burden, the opposing party must present material and substantial evidence, rather than mere conclusory or speculative statements, to raise a genuine issue of material fact. *Sullivan*, ¶ 14. The Court looks to the pleadings, depositions, answers to interrogatories, admissions on file, and affidavits to determine the existence or non-existence of a genuine issue of material fact. *Krebs v. Ryan Oldsmobile*, 255 Mont. 291, 294, 843 P.2d 312, 314 (1992). Disputes concerning only factual interpretations are properly handled on summary judgment. *Sprunk v. First Bank Sys.*, 252 Mont. 463, 466, 830 P.2d 103, 105 (1992). If the Court determines that no genuine issue of fact exist, the Court must then determine whether the moving party is entitled to judgment as a matter of law. *Valley Bank of Ronan v. Hughes*, 2006 MT 285, ¶ 14, 334 Mont. 335, 147 P.3d 185.

¶13 The District Court's interpretation of an employer's personnel policies is a question of law. *Wurl v. Polson Sch. Dist. No. 23*, 2006 MT 8, ¶¶ 16-18, 330 Mont. 282,

8

127 P.3d 436. This Court reviews a district court's conclusions of law to determine whether they are correct. *State v. Langley*, 2000 MT 251, ¶ 19, 301 Mont. 447, 11 P.3d 1192.

## DISCUSSION

¶14 The Montana Legislature enacted the Wrongful Discharge from Employment Act (WDEA) in 1987 with the purpose of providing the exclusive remedy for a wrongful discharge from employment. Section 39-2-902, MCA. The WDEA preempts all common law remedies, providing that no claim for discharge may arise from tort or express or implied contract. Section 39-2-913, MCA. Section 39-2-904(1), MCA, specifically provides that a discharge is wrongful only if:

> (a) it was in retaliation for the employee's refusal to violate public policy or for reporting a violation of public policy; (b) the discharge was not for good cause and the employee had completed the probationary period of employment; or (c) the employer violated the express provisions of its own written personnel policy.

"The clear and unambiguous language of the statute provides that *proof of any one* of the three elements will support a wrongful discharge action." *Krebs*, 255 Mont. at 295, 843 P.2d at 315 (emphasis added). Buckley alleges the District Court erred in granting WMMHC's motion for summary judgment and, in turn, denying her motion for partial summary judgment. Buckley claims her discharge was not for good cause and therefore was unlawful under § 39-2-904(1)(b), MCA. Additionally, she claims WMMHC terminated her in violation of its own express policy provisions, making her discharge unlawful under § 39-2-904(1)(c), MCA. We will address both subsection 39-2-904(1)(b) and (1)(c), MCA separately.

9

**Buckley's "good cause" claim under § 39-2-904(1)(b), MCA**

¶15 An involuntary discharge from employment is "wrongful" if "not for good cause." Section 39-2-904(1)(b), MCA. "Good cause" is defined as "reasonable job-related grounds for dismissal based on a failure to satisfactorily perform job duties, disruption of the employer's operation, or other legitimate business reason." Section 39-2-903(5), MCA. A "legitimate business reason" is a "reason that is neither false, whimsical, arbitrary or capricious, and . . . [that has] some logical relationship to the needs of the [employer's] business." *Buck v. Billings Mont. Chevrolet, Inv.*, 248 Mont. 276, 281-82, 811 P.2d 537, 540 (1991). The statutory "good cause" standard embodies the "right of an employer to exercise discretion" over the employer's particular needs and expectations when carrying on or performing the employer's business or function, without diminishing an employees' interest in maintaining employment. *Buck*, 248 Mont. at 281-82, 811 P.2d at 540. This Court has held that employers are afforded the greatest discretion where an employee occupies a "sensitive" managerial position and when the employee exercises "broad discretion" in her job duties. *Sullivan*, ¶ 18.

¶16 To prove "good cause," the employer must present evidence of "reasonable job-related grounds for dismissal based on a failure to satisfactorily perform job duties, disruption of the employer's operation, or other legitimate business reason." Sections 39-2-903(5) and -904(1)(b), MCA. Once the employer demonstrates good cause for the discharge, the burden shifts to the employee to show specific facts upon which to reasonably conclude that the given reason for discharge was: (1) not a job or business related reason; (2) false; (3) not the true reason for discharge; or (4) arbitrary, capricious,

10

or whimsical. *Speer v. State*, 2020 MT 45, ¶ 20, 399 Mont. 67, 458 P.3d 1016. Mere denial, speculation, or cursory assertion to the contrary is insufficient to satisfy the employee's responsive burden. *Speer*, ¶ 20.

¶17 We quickly note, it is undisputed that Buckley held a managerial position and exercised discretion in her role as program manager. Buckley was a managerial employee and WMMHC had broad discretion to determine whether she satisfactorily performed her duties and whether she properly exercised her discretion as a manager. We next turn to whether WMMHC had a legitimate business reason for terminating Buckley's employment. Here, as the District Court found, the undisputed evidence supported the conclusion that WMMHC lost confidence and trust in Buckley's ability to effectively manage the group homes consistent with WMMHC's policies protecting basic rights of its clients—found within its Employee Policies Handbook. An employer's loss of confidence and trust in a managerial employee's ability is a legitimate business reason sufficient to legally justify discharge under the WDEA. *Sullivan*, ¶ 25.

¶18 Buckley was responsible for the physical and emotional well-being of the group home clients. WMMHC concluded Buckley failed to adequately protect the fundamental needs and rights of its clients, who already suffered from vulnerable mental states. Buckley's Level System interfered with clients' abilities to recover in a healthy and safe manner. WMMHC, as an employer, had the discretion to determine that Buckley's actions demonstrated she was not proficient for the job and did not possess the requisite temperament to do the job consistent with WMMHC's vision and policies for the group homes.

11

¶19    Buckley correctly indicates that the discretion an employer has in handling managerial employees is not absolute. *Putnam v. Cent. Mont. Med. Ctr.*, 2020 MT 65, 399 Mont. 241, 460 P.3d 419. Buckley argues that, as in *Moe v. Butte-Silver Bow Cnty.*, 2016 MT 103, ¶ 54, 383 Mont. 297, 371 P.3d 415, she did not receive prior discipline, had satisfactory performance reviews, submitted detailed responses in her deposition, and denied the existence of problems. However, once a legitimate business reason was found, Buckley was required to submit evidence creating a dispute as to any material fact supporting that the reasons given for her termination were false, whimsical, or merely a pretext. *Putnam*, ¶ 27. Here, Buckley received notice of the client grievances in April 2019 and, subsequently, that WMMHC had lost confidence and trust in her abilities to serve as the program manager. Summary judgment is proper if the employee fails to provide evidence, beyond mere speculation, that the given reasons for the termination are a pretext, false, or not the honest reason. *Putnam*, ¶ 27. Buckley has failed to set forth evidence that WMMHC's reasons for her termination was anything but the honest reason.

¶20    In *Sullivan*, this Court affirmed a district court's order granting summary judgment in favor of the employer. Sullivan argued summary judgment was improper because genuine issues of material fact existed; specifically, Sullivan pointed to statements made by other employees who indicated Sullivan's actions were not inappropriate. *Sullivan*, ¶ 26. This Court held evidence of employee testimony to the contrary did not lessen the validity of the employer's decision that Sullivan's employment could threaten its future within Montana. Furthermore, Sullivan's generous treatment of some employees did not lessen his mistreatment of others or otherwise challenge the validity of their

complaints made against Sullivan. *Sullivan*, ¶ 27. In *McConkey*, this Court explained that "where the complaining employee is in an executive position, makes top level policy and strategic decisions, and great trust is placed in his judgment, courts must be cautious in second guessing employment decisions of the company's board." *McConkey*, ¶ 33. Finally, this Court held in *Baumgart* that a managerial employee lacked the necessary budget and finance competencies to serve as administrator of the Tourism Division, thus constituting a legitimate business reason for discharge. *Baumgart*, ¶ 37. The District Court's decision that WMMHC established a legitimate business interest in Buckley's termination is consistent with this precedent.

¶21 Accordingly, the burden shifted to Buckley to show specific facts that the given reason for discharge was: (1) not a job or business related reason; (2) false; (3) not the true reason for discharge; or (4) arbitrary, capricious, or whimsical. *Speer*, ¶ 20. The District Court concluded that, rather than providing the court with evidence WMMHC's decision was false, whimsical, arbitrary, or capricious, Buckley merely denied WMMHC's given reason for discharge. However, the fact that not *every* employee complained about Buckley does not, under the circumstances here, undermine the validity of the employer's reasons for discharging the employee. *See Sullivan*, ¶ 27. Buckley also argues a review of the allegations made against her does not suggest that "abuse" or "neglect," in fact, was present. A review of the record demonstrates that numerous clients complained about the negligent and, at times, willful acts Buckley took pursuant to her Level System—i.e., denying clients' rights to reasonable access to telephones and visitation; rights to wear their own clothes; rights to privacy and dignity; and rights to the least restrictive conditions

13

necessary to achieve the purposes of commitment. Although Buckley disputed numerous factual assertions made by WMMHC clients and staff, asserting her termination was in response to McGillen's anger toward her, there were nonetheless undisputed facts in the record establishing WMMHC had a genuine and real concern that Buckley's continued employment would constitute immediate harm to their business interests.

¶22 The District Court noted there were facts not in dispute that provided "good cause" for Buckley's discharge. We agree. Buckley did not dispute the number of corroborated complaints raised by clients and staff, nor did she argue or provide evidence that the claims were fabricated. Based on the complaints, WMMHC lost trust in Buckley, as its program manager, which constituted "good cause" for her termination. *See Sullivan*, ¶ 25. Having "good cause" to terminate Buckley as a managerial employee, it is not necessary to address WMMHC's other reasons for Buckley's discharge. *See generally Sullivan*; *Baumgart*, ¶ 38.

¶23 The WDEA requires the Court to consider whether WMMHC possessed a business reason that was not arbitrary or capricious to terminate Buckley's employment; however, it does not require a district court to conduct independent factfinding to determine the truth of the allegations presented in this matter. *Sullivan*, ¶ 38. Here, the District Court was presented with undisputed evidence demonstrating WMMHC's concerns and its legitimate business reasons for Buckley's termination. Buckley's evidence to the contrary did not create a factual dispute calling into question WMMHC's legitimate business concerns and good cause. Buckley failed to meet her burden of showing specific facts which would

14

challenge WMMHC's decision to terminate her. The District Court's decision to grant WMMHC summary judgment under § 39-2-904(1)(b), MCA, was correct.

**Buckley's personnel policy claim under § 39-2-904(1)(c), MCA**

¶24    An involuntary discharge from employment is wrongful if an employer discharged the employee in violation of "the express provisions of its own written personnel policy." Section 39-2-904(1)(c), MCA. The question of whether an employer violated its own written policies is a question of fact for the jury. *Hager v. J.C. Billion, Inc.*, 2008 MT 167, ¶ 22, 343 Mont. 353, 184 P.3d 340. Buckley asserts WMMHC terminated her in violation of its Policies and Procedures Manual, specifically the ethical violations involving professional licensing standards. Buckley refers to a portion of the Policies and Procedures Manual pertaining to licensed professionals, in which she claims that WMMHC did not provide her an opportunity for oral or written input on the allegations resulting in her termination. Conversely, WMMHC argues Buckley's termination was governed by its discipline policy within the Employee Policies Handbook.

¶25    The District Court noted the language Buckley relied upon pertained to violations of professional or ethical standards that have been submitted to the Professional Standards Review Committee, which was not at issue.[2] Instead, the District Court looked to WMMHC's Employee Policies Handbook which states:

---

[2] The relevant portion of the Policies and Procedures Manual, upon which Buckley relies, deals with ethical and professional violations. It utilizes a Review Committee, rather than the three-step grievance process meant for resolving discharge matters, and provides:

Where deemed appropriate by the investigating supervisor, or when requested by the employee who is subject of the complaint, a referral to the Professional Standards Review Committee may be made, whose duty shall be to review the

15

*An employee may be dismissed for severe and/or repeated violations of policy, protocol, regulation and rules or standard and/or continuous unsatisfactory performance.* A request to terminate an employee, whether or not they are in the probationary period, must be submitted to the Human Resources Director by the manager of the employee either verbally or in writing. The Human Resources Director will then collect all relevant information for review by the CEO for approval. Only upon the approval of the CEO or COO, may a supervisor, manager or director move forward with involuntary termination of an employee.

(Emphasis added.) The District Court was correct to note that decisions to terminate are governed by the policies contained within the Employee Policies Handbook because the numerous client grievances described abuse or neglect, and did not allege violations of licensing standards, or ethical or professional violations.

¶26 Buckley further asserts that her termination required progressive discipline based on a statement McGillen made in her deposition. WMMHC's Policies and Procedures Manual does not, however, mandate progressive disciplinary action and expressly provides that disciplinary actions are independent. Moreover, in *McConkey*, the employer had a written policy that related directly to McConkey's employment position as General Manager. McConkey argued the policy required progressive discipline because it contained the word "procedure" and a board member stated that they had a progressive disciplinary procedure. *McConkey*, ¶ 35. This Court rejected that argument, stating,

---

complaint from the perspective of standard practice within a respective discipline. Any investigation process will include opportunity for oral and written input from the employee who is under investigation. The investigating supervisor shall incorporate the recommendations of the Professional Standards Review Committee in his/her final disposition. A finding by the investigating supervisor of any unethical or professional violation may result in disciplinary action as outlined in the Personnel Policy and Procedures Manual.

"regardless of what one board member said about Board procedures, the fact remains that the policy did not expressly state that termination of the general manager required a progressive disciplinary procedure." *McConkey*, ¶¶ 35-36. We similarly reject Buckley's argument that a statement made by McGillen during her deposition, and the use of the word "procedure" in the decision letter, establishes that her termination required progressive discipline.

## CONCLUSION

¶27 WMMHC satisfied its burden to demonstrate it had legitimate business reasons constituting good cause for terminating Buckley as program manager. Buckley failed to meet her burden of demonstrating the reason for the termination was not a job or business related reason; false; not the true reason; or arbitrary, capricious, or whimsical. Finally, WMMHC met its burden of demonstrating that it did not violate the express provisions of its written personnel policies. We affirm the District Court's grant of WMMHC's motion for summary judgment.

/S/ LAURIE McKINNON

We concur:

/S/ JAMES JEREMIAH SHEA
/S/ BETH BAKER
/S/ INGRID GUSTAFSON
/S/ JIM RICE

17