FILED

12/12/2023

Bowen Greenwood
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 23-0231

DA 23-0231

IN THE SUPREME COURT OF THE STATE OF MONTANA

2023 MT 241

CARYN MISKE,

Plaintiff and Appellant,

v.

MONTANA DEPARTMENT OF NATURAL
RESOURCES AND CONSERVATION,

Defendant and Appellee.

APPEAL FROM:    District Court of the First Judicial District,
In and For the County of Lewis And Clark, Cause No. CDV 2019-216
Honorable Kathy Seeley, Presiding Judge

COUNSEL OF RECORD:

For Appellant:

Anne E. Sherwood, Frederick F. Sherwood, Morrison, Sherwood,
Wilson & Deola, PLLP, Helena, Montana

For Appellee:

Aislinn W. Brown, Agency Legal Services Bureau, Helena, Montana

Submitted on Briefs:  September 13, 2023

Decided:  December 12, 2023

Filed:

_____
Clerk

Chief Justice Mike McGrath delivered the Opinion of the Court.

¶1 Caryn Miske appeals an April 21, 2022 District Court order granting the Department of Natural Resources and Conservation (DNRC or Department) summary judgment on all of Miske's claims arising from her termination by DNRC from the Flathead Basin Commission. We affirm.

¶2 We restate the issues on appeal as follows:

*Issue One: Did the District Court err in granting summary judgment to DNRC on Miske's claim of intentional interference with contractual relations?*

*Issue Two: Did the District Court err in granting summary judgment to DNRC on Miske's discrimination claims?*

*Issue Three: Did the District Court err in granting summary judgment to DNRC on Miske's wrongful discharge claims?*

**FACTUAL AND PROCEDURAL BACKGROUND**

¶3 The 1983 Legislature established the Flathead Basin Commission (Commission) to "protect the existing high quality of the Flathead Lake aquatic environment; the waters that flow into, out of, or are tributary to the lake; and the natural resources and environment of the Flathead basin." Section 75-7-302, MCA.

¶4 According to the job description for its executive director, the Commission "works to accomplish its statutory mandate in a consensus-building manner, stressing education, cooperation, broadly based community involvement, partnerships with agencies and nonprofit groups, and the voluntary participation of Basin residents."

¶5 The Commission has statutory authority to "make recommendations to the legislature and the governor and to federal, tribal, provincial, and local agencies for

2

maintenance and enhancement of the quality of natural resources of the Flathead basin," and to "receive and expend donations, gifts, grants, and other money necessary to fulfill its duties." Section 75-7-305(1), (2), MCA.

¶6 The Commission is attached to DNRC for "administrative purposes only," meaning DNRC has the authority to "direct and supervise the budgeting," and to "transfer employees between positions, remove persons appointed to positions, and change the duties, titles, and compensation of employees" within the Commission. Sections 2-15-121(2)(a), -112(2)(a), MCA. The Commission has independent authority when acting in "quasi-judicial, quasi-legislative, licensing, and policymaking roles." Section 2-15-121(1)(a)(i), MCA.

¶7 Caryn Miske was hired as Executive Director of the Commission in 2006 by its own hiring committee. The position was advertised by DNRC, as a DNRC position, and the hiring process proceeded through DNRC channels; this included her "onboarding," during which Miske signed paperwork acknowledging she was a DNRC employee and agreeing to DNRC public information policies and rules of conduct. Miske's job description was approved by DNRC Director Mary Sexton.

¶8 There was never a clear delineation of primary responsibility for staffing decisions between DNRC and the Commission. In 2007, DNRC's Chief Legal Counsel sought to clarify the scope of the Commission's attachment to DNRC in a memorandum to Sexton, which provided: "Commissions attached for administrative purposes cannot hire their own personnel unless otherwise specifically provided for by statute. Where commissions are allowed to hire their own personnel, State of Montana hiring procedures must be followed."

3

A signed 2008 Memorandum of Understanding (MOU) provided the Commission with supervision over the Executive Director, but there was no clear language in the MOU regarding responsibility for staffing decisions.

¶9 DNRC and the Commission revisited the MOU in 2009 in an attempt to clarify responsibility for staffing decisions. A revised MOU was never signed because the parties disagreed about language specific to staffing. DNRC determined the language proposed by Miske and the Commission departed significantly from the Department's interpretation of statute, and Sexton instructed staff that the Department would proceed under DNRC's unsigned draft MOU in all dealings with the Commission.

¶10 Miske's duties included financial administration, overseeing expenditures and meeting reporting timelines for the Commission's various funding sources, and coordinating and facilitating the Commission's extensive program work, including monitoring legislation at the Montana Legislature. Every aspect of Miske's job description was intertwined in some respect with DNRC. She received extensive support from DNRC staff with financial administration, and she had a clear responsibility to coordinate with and report to DNRC on the impacts of proposed legislation.

¶11 During her tenure, Miske established a record of poor financial management and a reputation for contributing to a "mutual distrust" between the Commission and DNRC, particularly over differences of opinion regarding the aquatic invasive species program.

¶12 Miske was formally reprimanded by DNRC in 2011 for failures to meet financial and grant reporting requirements, mismanagement of contracts and grant funding, and failures to timely submit statements for her state-issued credit card. Although she

responded positively to that warning at first, Miske's supervisors continued to remark in performance evaluations about issues with leadership and coordination with DNRC on the aquatic invasive species program.

¶13 Issues resulting from Miske's financial mismanagement resurfaced in 2014 and persisted through the remainder of her employment. Emails show that there was extensive back-and-forth between DNRC financial administrators, Miske's direct reports, and Miske regarding deficiencies with reporting obligations and repeated failures to provide DNRC staff with state-issued credit card statements.

¶14 On December 5, 2017, Miske received notice of a personnel investigation and was placed on administrative leave. Miske then received a Notice of Results of Personnel Investigation and Opportunity to Respond on January 10, 2018.

¶15 The investigation found that Miske "demonstrated a consistent unwillingness to comply with agency protocol regarding financial management, reporting, and communication." Further, Miske failed to comply with DNRC cash-handling policies, and "on at least two occasions," Miske solicited donations for the Commission but diverted the funds to accounts that were not administered by DNRC. The "crux" of DNRC's concerns was that Miske was "unwilling and consistently resistant to conducting [her]self as an employee of the department."

¶16 Miske disputed the results of the investigation, but she was ultimately terminated by DNRC on February 26, 2018, after finding Miske's responses "unpersuasive."

¶17 On February 26, 2020, Miske filed an eight-count amended complaint alleging claims arising from her termination by DNRC. On August 12, 2020, the First Judicial

5

District Court, Lewis and Clark County, dismissed three counts. On April 21, 2022, the District Court granted DNRC summary judgment on all of Miske's remaining claims. Miske appeals the District Court's grant of summary judgment.

## STANDARD OF REVIEW

¶18 We review a district court's summary judgment decision de novo, for conformity with M. R. Civ. P. 56. *MEA-MFT v. McCulloch*, 2012 MT 211, ¶ 10, 366 Mont. 266, 291 P.3d 1075. A district court's interpretation of statutory language is also reviewed de novo, as a question of law. *McCulloch*, ¶ 10.

## DISCUSSION

¶19 The threshold issue is whether Miske was a DNRC or Commission employee. The Commission is administratively attached to DNRC, therefore their roles in the administration of the Commission are fundamentally intertwined by statute and the Montana Constitution. We thus approach this discussion with the requisite historical backdrop.

### *Executive Reorganization*

¶20 Prior to the 1970s, accountability in Montana's Executive Branch was spread across 188 different state agencies. *Exec. Reorganization: Rep. to the Mont. Legis. Assemb.*, 12-1970, Mont. Comm'n on Exec. Reorganization at 41 (1970) [hereinafter Exec. Reorganization Comm'n Rep.]. Forrest Anderson campaigned for governor in 1968 on a platform to bring agency functions into a smaller orbit so the Executive Branch would

operate more efficiently.[1]  Following Anderson's election, the Legislature established the Montana Commission on Executive Reorganization.  1969 Mont. Laws ch. 293.  The Commission was tasked with assessing the then-existing structure of the Executive, and it spent the following two years developing, then implementing its 300-page report at the Montana Legislature.  *See generally* Exec. Reorganization Comm'n Rep.  The Montana Legislature passed the Executive Reorganization Act in 1971.  1971 Mont. Laws ch. 272.

¶21    Shortly after the passage of the Executive Reorganization Act, delegates to the Constitutional Convention of 1972 met to enshrine Montana's collective values in law.  A central objective of the delegates was to re-establish the "fundamental concept of checks and balances by separate branches of government." *Bullock v. Fox*, 2019 MT 50, ¶ 18, 395 Mont. 35, 435 P.3d 1187 (quoting Montana Constitutional Convention, Committee Proposals, February 17, 1972, Vol. I, pp. 449-50).  The Constitutional Convention's emphasis on executive reorganization reflected the Commission's goals, and in 1972, the newly ratified Constitution thus provided: "[A]ll [agencies] . . . and their respective functions, powers, and duties, shall be allocated by law among not more than 20 principal departments so as to provide an orderly arrangement in the administrative organization of state government. . . ."  Mont. Const., art. VI, § 7.

¶22    As a result of executive reorganization and the 1972 Constitution, 16 departments, including DNRC, are established under § 2-15-104(1)(n), MCA.  Each has a "department

---

[1] "[Anderson] proposed that the 100 state boards, bureaus, and commissions made it virtually impossible for a governor and legislature to be effective.  His resounding slogan became 'Twenty is Plenty!'" Ted Schwinden, *Political Evolution – Political Revolution*, 43 Pub. Land & Resources L. Rev. 27, 30 (2020).

head" with the authority to "transfer employees between positions, remove persons appointed to positions, and change the duties, titles, and compensation of employees within the department." Section 2-15-112(2)(a), MCA. Although dozens of executive agencies were eliminated altogether during executive reorganization, many were attached to the Departments so the essential functions of more than 100 agencies could be subsumed. *See* § 2-15-121(1)(a)(i), MCA.

¶23 The Commission was a model for the adaptability of the Executive Branch. The Legislature recognized an unaddressed need for regional water quality management in the Flathead basin, and in 1983 it established the Commission accordingly. 1983 Mont. Laws ch. 424, § 4. The Commission was originally attached to the Office of the Governor "for administrative purposes only," and its Executive Director was a member of the Governor's staff. Section 2-15-213(4), (2)(a), MCA (1983) (recodified at § 2-15-3330, MCA). At first, the Commission's Executive Director was thus appointed by the governor. The 1999 Legislature removed the requirement that the Executive Director be a member of the Governor's staff and provided the Commission statutory authority to hire "sufficient and appropriate" staff. 1999 Mont. Laws ch. 243, § 2. The 2003 Legislature then transferred the Commission's attachment from the Governor's Office to DNRC. 2003 Mont. Laws ch. 537, § 1.

*DNRC and the Commission*

¶24 Miske's claims rely on an undercurrent premise that DNRC does not have statutory authority to make staffing decisions on behalf of the Commission. DNRC counters that its

8

statutory authority is clear. We address this dispute first, then turn to Miske's specific claims below.

¶25 We interpret a statute first by looking to its plain language. *Mont. Sports Shooting Ass'n v. State*, 2008 MT 190, ¶ 11, 344 Mont. 1, 185 P.3d 1003. We will not insert language into a statute that was omitted or omit that which was inserted. Section 1-2-101, MCA; *Clark Fork Coal. v. Tubbs*, 2016 MT 229, ¶ 20, 384 Mont. 503, 380 P.3d 771. When a statute is unclear or ambiguous, we then strive to implement the Legislature's objectives. *Wangerin v. State*, 2022 MT 236, ¶ 17, 411 Mont. 1, 521 P.3d 36. When ascertaining the Legislature's intent, we presume the Legislature does not pass meaningless legislation, and we harmonize statutes relating to the same subject to give as much effect as possible to each. *Oster v. Valley Cnty.*, 2006 MT 180, ¶ 17, 333 Mont. 76, 140 P.3d 1079.

¶26 Miske argues that the Commission's independent authority to "hire staff for the purpose of carrying out its duties," under § 2-15-3332(1), MCA, clearly implies a legislative intent to prohibit DNRC from terminating Commission staff. As the District Court appropriately noted, however, other statutes give DNRC authority to "provide staff for the agency," § 2-15-121(2)(d), MCA, and to "remove persons appointed to positions." Section 2-15-112(2)(a), MCA. Even though § 2-15-121(2)(d), MCA, separately provides that attached agencies like the Commission "may not hire personnel" "[u]nless otherwise indicated in this chapter," this provision does not somehow operate inversely to restrict DNRC's authority under §§ 2-15-112(2)(a) and -121(2)(d), MCA, as Miske contends. We will not construe the statute to give effect to Miske's interpretation when the plain language does not support her conclusions. *Clark Fork Coal.*, ¶ 20.

9

¶27 While the Legislature may limit DNRC's authority over staffing within attached agencies when it finds it prudent, it has done so expressly. Like the Commission, the implementing provisions for the Board of Oil and Gas Conservation provide that it is attached to DNRC "for administrative purposes only." Section 2-15-3303(3), MCA. They also provide, however, that "the board may hire its own personnel, *and 2-15-121(2)(d) does not apply*." Section 2-15-3303(3), MCA (emphasis added). Read together, the omission of similar language restricting DNRC's authority over Commission personnel decisions indicates the Legislature did not intend to limit it at all. Otherwise, the statutory restriction of DNRC's role in Board of Oil and Gas Conservation personnel decisions would be meaningless. Section 2-15-3303(3), MCA; *see Oster*, ¶ 17.

¶28 Harmonizing the statutes in this way comports with the clear purpose of administrative attachment, which was to focus administrative power in—rather than expand it from the Departments. DNRC's authority to make personnel decisions at the Commission does not restrict the Commission's independent power to exercise "quasi-judicial, quasi-legislative, licensing, and policymaking functions." Section 2-15-121(1)(a)(i), MCA.

¶29 The plain language and structure of the statutes governing the Commission, and agency attachment generally, indicate the Legislature intended the Commission and DNRC to have concurrent authority over Commission staffing decisions. The District Court correctly ruled that Miske was a DNRC employee. We thus approach the issues on appeal accordingly.

10

¶30　*Issue One: Did the District Court err in granting summary judgment to DNRC on Miske's claim of intentional interference with contractual relations?*

¶31　DNRC is not liable to Miske for the intentional tort of interference with contractual relations because DNRC was not a stranger to her relationship with the Commission.

¶32　Intentional interference with contractual relationship occurs when a "stranger to the contractual or business relationship at issue" intentionally and improperly "interfere[s] with the performance of a contract . . . between another and a third person, by preventing the other from performing the contract or causing his performance to be more expensive and burdensome." *Wagner v. MSE Tech. Appl. Inc.*, 2016 MT 215, ¶ 19, 384 Mont. 436, 383 P.3d 727 (citation omitted).

¶33　Miske contends that even if DNRC and the Commission shared authority in Commission staffing decisions, the Commission's "ultimate authority over her position" made DNRC a "stranger" to her employment with the Commission. Although she illustrates the comprehensive role the Commission played in her employment, Miske does not articulate a cogent argument illustrating how DNRC was a "stranger." A Commission hiring committee hired Miske, but the process certainly was not independent of DNRC oversight. On the contrary—Miske's job description was signed and approved by the Department head, Miske agreed to and signed onboarding paperwork indicating she was a DNRC employee, and ultimately, DNRC had administrative oversight over most of her work. Regardless of the Commission's authority, Miske was clearly a DNRC employee, and DNRC's involvement in her work and relationship with the Commission was its prerogative.

¶34 The District Court did not err in granting summary judgment to DNRC on this claim because DNRC was not a stranger to Miske's relationship with the Commission.

¶35 *Issue Two: Did the District Court err in granting summary judgment to DNRC on Miske's discrimination claims?*

¶36 Further, Miske's lobbying efforts on behalf of the Commission were not protected under Montana's Human Rights Act or the Governmental Code of Fair Practices because she was acting in her official capacity as a DNRC employee when she lobbied on behalf of the Commission.

¶37 The Montana Human Rights Act (MHRA) provides "[i]t is unlawful discriminatory practice for the state or any of its political subdivisions . . . to refuse employment to a person . . . because of that person's political beliefs." Further, the Governmental Code of Fair Practices requires that "State and local government officials and supervisory personnel shall . . . evaluate . . . personnel on the basis of merit and qualifications without regard to . . . political ideas." Section 49-3-201(1), MCA. However, "when a public employee speaks out not as a citizen upon matters of public concern, but instead as an employee upon matters of only personal interest, the courts will not review the wisdom of a personnel decision taken by a public agency." *Taliaferro v. State*, 235 Mont. 23, 29, 764 P.2d 860, 864 (1988) (citing *Connick v. Myers*, 461 U.S. 138, 103 S. Ct. 1684 (1983)).

¶38 We have previously ruled that when an individual lobbies on a matter of public interest in her personal capacity, her speech is protected by the First Amendment. *Taliaferro*, 235 Mont. at 30, 764 P.2d at 865. Prior to interviewing for a job with Social and Rehabilitative Services (SRS), Taliaferro lobbied on legislation concerning SRS

12

long-term care ombudsmen that SRS did not support. *Taliaferro*, 235 Mont. at 25-26, 764 P.2d at 862. A jury determined SRS had later denied a full-time position to Taliaferro because of her position on the ombudsmen issue. *Taliaferro*, 235 Mont. at 27, 764 P.2d at 863. We affirmed the District Court, upholding the discrimination verdict because Taliaferro's speech was protected by the First Amendment. *Taliaferro*, 235 Mont. at 30, 764 P.2d at 865. Conversely, Miske engaged in lobbying efforts that caused "mutual distrust" between the Commission and DNRC while she was a DNRC employee, in her capacity as the Commission's Executive Director. Unlike Taliaferro, Miske was not lobbying in her personal capacity.

¶39 Miske contends that because the Commission has authority under § 75-7-305(1), MCA, to make recommendations to the Legislature and federal agencies, she acted within the scope of that authority when lobbying crosswise to DNRC's position on aquatic invasive species issues. Notwithstanding the Commission's authority to lobby, however, Miske's speech was not protected political speech because she was lobbying in her capacity as a DNRC employee.

¶40 The District Court correctly granted DNRC summary judgment on Miske's discrimination claims.

¶41 *Issue Three: Did the District Court err in granting summary judgment to DNRC on Miske's wrongful discharge claims?*

¶42 Finally, DNRC had good cause to terminate Miske's employment because of her repeated failures to comply with DNRC's state-issued credit card expense reporting policies.

13

¶43 The Wrongful Discharge from Employment Act (WDEA) forbids termination of a non-probationary employee without "good cause." Section 39-2-904(b), MCA. "Good cause" can mean "any reasonable job-related grounds for an employee's dismissal" based on a "failure to satisfactorily perform job duties," "disruption of the employer's operation," or "other legitimate business reasons . . . ." Section 39-2-903(5), MCA. Further, a "legitimate business reason" may be one that is not "false, whimsical, arbitrary or capricious and . . . must have some logical relationship to the needs of the business." *Baumgart v. State*, 2014 MT 194, ¶ 35, 376 Mont. 1, 332 P.3d 225.

¶44 In WDEA claims, after an employer satisfies the burden to present evidence of "good cause" for a termination, the burden shifts to the employee "to show specific facts upon which to reasonably conclude that the given reason for discharge was: (1) not a job or business related reason; (2) false; (3) not the true reason for discharge; or (4) arbitrary, capricious, or whimsical." *Buckley v. W. Mont. Cmty. Mental Health Ctr.*, 2021 MT 82, ¶ 16, 403 Mont. 524, 485 P.3d 1211. "Mere denial or speculation will not suffice" to show that a fact is a pretext and not the honest reason for a discharge. *Baumgart*, ¶ 37.

¶45 When ruling on a summary judgment motion in WDEA claims, any facts establishing "good cause" are sufficient to find for an employer, even if other disputed facts remain. *Davis v. State*, 2015 MT 264, ¶ 14, 381 Mont. 59, 357 P.3d 320. In making this determination, "All reasonable inferences which can be drawn from the evidence presented must be drawn in favor of the non-moving party." *Vettel-Becker v. Deaconess Med. Ctr. of Billings*, 2008 MT 51, ¶ 27, 341 Mont. 435, 177 P.3d 1034 (citation omitted).

14

¶46     Miske argues DNRC did not have a "legitimate business reason" for her termination. She contends the sole *undisputed* factual basis for awarding DNRC summary judgment on her wrongful discharge claims is that "three months of ProCard receipts were late." Further, Miske disputes the reason the receipts were late, arguing that other work priorities prevented her from timely turning them in to DNRC. However, the record shows that Miske was late on submitting substantially more than just three state-issued credit card statements. In addition to the violations for which she was reprimanded in 2011, Miske was notified about three delinquent statements in 2014, five in 2016, and six more in 2017. There was substantial back-and-forth about Miske's delinquent statements, and the record clearly depicts a pattern of failures to adhere to DNRC policy.

¶47     DNRC has authority to "direct and supervise the budgeting" of the Commission. Section 2-15-121(2)(a), MCA. One facet of administering that directive is to ensure that state-issued credit card reporting policies are followed by its employees. Miske established a pattern of violating that policy, which is a legitimate reason to terminate her employment. Miske has not adequately shown facts that would demonstrate her termination was false, pretextual, not business-related, or that it was otherwise arbitrary, capricious, or whimsical. *Buckley*, ¶ 16; *Davis*, ¶ 14. To the contrary, Miske argues pretext may be found in record evidence—emails and statements from her supervisor—that actually *supports* a finding of Miske's poor financial management. Even viewing the evidence in a light most favorable to Miske, there is no evidence that indicates DNRC used Miske's failures to timely report credit card statements as a pretext for other reasons it had for terminating her.

¶48 Miske argues her claim is distinguishable from *Baumgart*, where an administrator for the Montana Tourism and Promotion Division of the Department of Commerce (Division) was similarly terminated for financial mismanagement. *Baumgart*, ¶ 7. There, the District Court determined, and we agreed, that Baumgart was terminated with good cause because she risked losing over $4 million by carrying that amount in the Division's fund balance. *Baumgart*, ¶¶ 33, 39. Legislative appropriations can "sweep" certain fund balances into the general fund, which Baumgart was well aware of because she experienced a legislative appropriation just after she took over as the Division administrator. *Baumgart*, ¶¶ 4, 33. Baumgart was lawfully terminated even though she had never received a performance-based warning, write-up, or reprimand. *Baumgart*, ¶ 44. Here, Miske accurately points out that her failure to timely submit state-issued credit card statements is disproportionate to risking the loss of more than $4 million.[2] Miske, however, *was* warned, written-up, and reprimanded. Different factors carried more weight in Miske's termination than in Baumgart's, and vice-versa, but the outcome is appropriately the same. "An employer has broad discretion to terminate a person in an executive position." *Shepherd v. State*, 2023 MT 99, ¶ 18, 412 Mont. 330, 529 P.3d 1285 (internal quotation omitted). The Department lawfully exercised its broad discretion to terminate the Executive Director of the Commission here.

---

[2] The record is well-developed regarding other reasons DNRC may have had for terminating Miske's employment. We decline to address those facts here, however, because they are disputed, and as the District Court found, DNRC properly established good cause around at least one undisputed fact, which is sufficient to award it summary judgment. *Davis*, ¶ 14.

¶49 The District Court properly granted DNRC summary judgment on Miske's wrongful discharge claims.

## CONCLUSION

¶50 Montana law provides DNRC with clear authority in personnel decisions within the Commission, which aligns with the purpose and legislative intent for agency attachment. Miske was a DNRC employee, thus DNRC was not a stranger to Miske's relationship with the Commission, and it did not unlawfully interfere with their contractual relations. Further, Miske's lobbying efforts on behalf of the Commission were made in her capacity as a DNRC employee; therefore, her political speech is not protected First Amendment speech. Finally, DNRC had good cause to terminate Miske because repeated failures to provide DNRC with state-issued credit card statements constitute a legitimate business reason for her termination, and there is no evidence that it was a pretextual or dishonest reason.

¶51 We affirm the District Court on all of Miske's claims.

/S/ MIKE McGRATH

We Concur:

/S/ JAMES JEREMIAH SHEA
/S/ INGRID GUSTAFSON
/S/ DIRK M. SANDEFUR
/S/ JIM RICE

17